Albert W. **OVERHAUSER** and Margaret M. Overhauser, Plaintiffs–Appellants,

v.

**UNITED STATES of America,** Defendant–Appellee.

No. 94–2551.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 1, 1994.

Decided Jan. 18, 1995.

Warren Nemiroff (argued), Beverly Hills, CA, plaintiffs-appellants.

Gary R. Allen, Teresa McLaughlin, Kenneth W. Rosenberg (argued), Sara S. Holderness, Washington, DC, Samuel D. Brooks, Dept. of Justice, Tax Div., Appellate Section, Washington, DC, for defendant-appellee.

Before POSNER, Chief Judge, and BRIGHT * and KANNE, Circuit Judges.

POSNER, Chief Judge.

The Overhausers sued in federal district court to obtain a refund of federal income taxes, interest, and penalties for the years 1981 through 1986. With respect to part of their claim, the district judge held that the plaintiffs had failed to ask the Internal Revenue Service for a refund within the statutory period; and while the plaintiffs challenge this determination on appeal, their challenge is so patently without merit that it requires no discussion. With respect to the part of the claim that is not barred by the administrative statute of limitations, the appeal presents a more interesting question, involving the interpretation of an agreement between the plaintiffs and the Internal Revenue Service.

In 1981 the plaintiffs invested in a tax shelter that enabled them to purchase food transport containers. They claimed on their federal income tax returns, for that and succeeding years, investment tax credits on the purchase and deductions for depreciation. The IRS disallowed some of their claims, precipitating a dispute that was resolved by an agreement between the plaintiffs and the IRS. The agreement included a provision that "any future cash payments required by a court of law with respect to notes financing the purchase of the containers, will be allowed either as a depreciation expense or an operating expense starting in the year paid."

Nine years later the tax shelter had gone broke and the plaintiffs were ordered to pay the trustee in bankruptcy $225,000 to make good on promissory notes which they had issued to the tax shelter when they bought the food storage containers back in 1981. Under the agreement with the IRS that we have quoted, the plaintiffs could, the parties agree, have deducted the payment to the trustee on the plaintiffs' 1990 return as an operating expense. What they wanted to do, however, and what the government seconded by the district court has said they may not do, is to add the $225,000 to the original basis of the containers, reopen their tax returns for 1981 through 1986, and take additional depreciation deductions on those returns by reason of the higher basis. The question is whether the agreement that we quoted, settling the earlier dispute over the Overhausers' tax liability arising from the tax shelter, permits this.

The parties have treated us to an unedifying dispute over punctuation. The government argues that because there is no comma after "depreciation expense," the qualifying phrase "starting in the year paid" must go with both "depreciation expense" and "operating expense," and therefore any depreciation expense arising from the bankruptcy court's order to pay had to be taken in 1990, when the payment was made. The taxpayers argue that without commas after both "depreciation expense" and "operating expense," the qualifying phrase "starting in the year paid" can go only with "operating expense." The parties' arguments assume, first, that there is a clear rule of grammar by which the scope of a qualifying phrase can be determined from the placement of commas, and, second, that the agreement was drafted by a grammarian or at least by someone knowledgeable about obscure rules of grammar.

* Hon. Myron H. Bright of the Eighth Circuit.

As to the first, neither side has favored us with any reference to a work of grammar. Each is content to assert that its position is self-evident. As to the second issue, if one thing is clear it is that the draftsman of the agreement was no grammarian, for he placed a comma after "containers," which, as the parties conceded at argument, is ungrammatical. And proper grammar required an "as" before "an operating expense" ("either as a depreciation expense or as an operating expense"). Since the draftsman was not a grammarian, we do not see how consulting a work of grammar would illuminate the meaning of the agreement.

More important than what a grammar book unlikely to have been consulted by anyone involved in the actual drafting of the agreement says is the actual *practice* of the relevant linguistic community, a practice that in matters of the placement of commas is notably casual. *United States v. Caputo*, 978 F.2d 972, 973–74 (7th Cir.1992). The Supreme Court cannot make up its mind whether to be skeptical or credulous about imputing grammatical expertise to drafters of legal documents and using the imputation to decide interpretive questions. Compare *United States National Bank of Oregon v. Independent Insurance Agents of America, Inc.*, — U.S. —, —, 113 S.Ct. 2173, 2182, 124 L.Ed.2d 402 (1993), and *United States v. Bass*, 404 U.S. 336, 340 n. 6, 92 S.Ct. 515, 518 n. 6, 30 L.Ed.2d 488 (1971) (skeptical), with *International Primate Protection League v. Administrators of Tulane Educational Fund*, 500 U.S. 72, 80, 111 S.Ct. 1700, 1705, 114 L.Ed.2d 134 (1991), and *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241–42, 109 S.Ct. 1026, 1030–31, 103 L.Ed.2d 290 (1989) (credulous). We side with the skeptics. See also Lawrence M. Solan, *The Language of Judges* (1993).

It might seem that the government's position, while not to be rejected on grammatical grounds, is senseless, because how could a cash payment be allowed as a depreciation expense in the year in which the payment was made? A depreciation expense is an accounting entry rather than an out-of-pocket expenditure, and when a payment, say to purchase a building, gives rises to a deprecia-tion expense because the asset bought with the payment is durable and its value therefore not exhausted in the year of purchase, the expense is spread out over several years on the books of the company. An expense incurred for an asset whose value is exhausted in one year is a current expense; the asset is not depreciable if its useful life, is so short.

But as the government's lawyer explained at argument without being contradicted, the Overhausers were free under the agreement to add the $225,000 to the depreciated basis of the containers in 1990 and to depreciate the stepped-up basis over the containers' remaining useful life much as if the owner of a building had spent $225,000 to build an addition to it. Depending on the Overhausers' other income in 1990 and on their anticipated income, and on anticipated tax rates, in future years (notice our careful placement of commas), such treatment of the payment might be more advantageous to them than treating it as an operating expense to be deducted *in toto* in 1990.

This point supports the government's reading, for it explains the inclusion of the word "starting." On the taxpayers' view, if they elect to treat the future cash payments as a depreciation expense they can do so in any year, but if they elect to treat it as an operating expense they must do so "*starting* in the year paid" (emphasis added). If treatment *starts* in one year, however, the implication is that it continues into the next year or subsequent years. Yet an operating expense, as we have noted, would be deducted in the year incurred. 26 U.S.C. § 162(a); *Encyclopaedia Britannica, Inc. v. Commissioner*, 685 F.2d 212, 216–17 (7th Cir.1982). It is not an operating expense, but depreciation, that is spread over a period of years. If the "future cash payments" to which the agreement settling the earlier dispute refers are depreciated rather than expensed, the depreciation expense *starts* in the year the payments are made but continues in subsequent years. So "starting in the year paid" makes sense only when matched with "depreciation expense," which is the opposite of the taxpayers' position.

The government proposes, as we have pointed out, to allow the taxpayers to add the payments to the basis of the containers in the year paid and deduct depreciation in that and succeeding years until the containers are completely depreciated. It balks merely at allowing the taxpayers to add the payments to the original basis of the containers and reopen their old tax returns to permit the depreciation deducted on those returns to be recomputed. There is no purchase in the language of the agreement for the taxpayers' position, whereas the government's has the support of the phrase "starting in the year paid."

Admittedly, this is a finespun distinction; and the Overhausers want merely an opportunity to prove that the parties to the agreement intended the reopening of the tax returns to be an option. They want, to speak more concretely, a hearing at which they themselves will testify to their understanding of the agreement, along with the government employees who negotiated it with them. If the agreement is genuinely ambiguous, they are entitled to that hearing, just as they would be in any contract case. *Banque Paribas v. Hamilton Industries Int'l*, 767 F.2d 380 (7th Cir.1985). But even though we reject the government's grammatical arguments and do not give conclusive weight to the point (not argued by the government, incidentally) about the significance of "starting in the year paid," we do not think the agreement is ambiguous. "Ambiguity" in the law is a term to which legal consequences attach, and we should consider those consequences in determining its meaning in particular settings. The consequence of a judgment of ambiguity in a contract case is that the meaning of a written contract will be decided by a swearing contest rather than by reading the contract and trying to make the best sense of it that one can without hearing the parties' inconsistent stories about what the contract *really* means. These swearing contests are both costly and inconclusive, which is to say that they give rise not only to direct costs in money and time of litigants (not to mention the time of the courts) but also to the indirect costs that legal error, which undermines the institution of contract, generates. If, therefore, without taking evidence, a court can have reasonable confidence that it knows what the contract means, it ought not to put the litigants (and the trier of fact) to the bother, expense, and uncertainty of a trial or other evidentiary hearing. For illustrations of this principle in the context of tax settlement agreements, see *Smith v. United States*, 850 F.2d 242, 245 (5th Cir.1988); *United States v. Means*, 621 F.2d 236, 238 (6th Cir.1980) (per curiam); *Robbins Tire & Rubber Co. v. United States*, 462 F.2d 684, 687–88 (5th Cir.1972).

Even in such a case, interpretation does not proceed in a vacuum. *Florida East Coast Ry. v. CSX Transportation, Inc.*, 42 F.3d 1125, 1128 (7th Cir.1994). Meaning does not inhere in words; meaning is interpretation. The court looks at everything it can find without holding an evidentiary hearing, and if it is satisfied that it can infer the meaning of the contract from the information accessible to it without a hearing, it pronounces the contract unambiguous and forgoes the hearing; the bare words of the contract have been disambiguated without recourse to a hearing. That is our situation here.

When the agreement with the IRS was signed in 1986, the taxpayers had been deducting expenses related to the tax shelter on their tax returns for five years. The normal statute of limitations for reopening a tax return is three years from the date of filing or two years from the date the tax was paid (whichever is later), 26 U.S.C. § 6511(a); so if the taxpayers' interpretation is correct, the government was agreeing to waive the statute of limitations. The problem with this interpretation is that government officers have no general power to waive statutes of limitations in tax cases. *United States v. Garbutt Oil Co.*, 302 U.S. 528, 534–35, 58 S.Ct. 320, 323–23, 82 L.Ed. 405 (1938); *Vishnevsky v. United States*, 581 F.2d 1249, 1252 and n. 3 (7th Cir.1978); *Missouri Pacific Ry. v. United States*, 558 F.2d 596, 599, 214 Ct.Cl. 623 (1977); *Berry v. Commissioner*, 97 T.C. 339, 347, 1991 WL 181772 (1991). There are several specific statutory authorizations for such waivers, see 4 Boris Bittker & Lawrence Lokken, *Federal Taxation of Income,*

*Estates and Gifts* ¶ 112.5.3 (2d ed. 1994), but none of them is applicable here. The closest is the power granted by 26 U.S.C. § 6532(a)(2) to extend the two-year deadline for the taxpayer to sue after the IRS denies his claim, but what the taxpayers want to do in this case is extend the deadline for requesting a refund. Cf. *Haber v. United States,* 831 F.2d 1051, 1053 (Fed.Cir.1987), amended, 846 F.2d 1379 (1988).

The internal revenue agents who signed the agreement with the taxpayers may have been acting ultra vires, but that should not be presumed and even if the agents were acting in excess of their powers, this would not entitle the taxpayers to enforce the agreement unless they had grounds for an estoppel (which they do not argue)—and perhaps not even then. *Oropallo v. United States,* 994 F.2d 25, 28–31 (1st Cir.1993) (per curiam), holds that, despite *Irwin v. Department of Veterans Affairs,* 498 U.S. 89, 95–96, 111 S.Ct. 453, 457–58, 112 L.Ed.2d 435 (1990), which appears to establish a presumption that the doctrine of equitable estoppel can be invoked as a basis for delaying the running of statutes of limitations against the federal government, the doctrine cannot be invoked to delay the time for seeking a tax refund. We left the issue open in *L & H Co. v. United States,* 963 F.2d 949, 952 (7th Cir.1992), and do so again today, since its resolution would not affect the outcome of this case.

█ Another point in the government's favor is that there is no basis in *substantive* tax law (forget the statute of limitations) for the form of retroactive tax adjustment sought by the taxpayers. They had bought the food storage containers back in 1981 with a combination of cash or other "hard" consideration and promissory notes that they did not expect ever to have to make good on. For obvious reasons only the "hard" consideration was allowed to determine the containers' basis for purposes of computing depreciation deductions from the Overhausers' income tax. Later of course they did have to pay the promissory notes, but that was because of events that occurred after 1981 and it therefore did not show that the containers had "really" cost more *in 1981* than the hard consideration. So the readjustment that the Overhausers claim to be entitled to by virtue of the agreement has no basis in the principles of tax law. And for another reason: the Overhausers want to deduct 1990 dollars on their 1981 through 1986 tax returns, ignoring the time value of money. Had they known for sure in 1981 that the food storage containers would cost another $X dollars in 1990, they could have deducted only the present value of that future cost, not the full $X— which they now want credit for on those old returns. They seek a windfall. (Actually the law was confused on this point back then. It has since been clarified to eliminate a future possibility of such windfalls. See 26 U.S.C. § 461(h); Bittker & Lokken, *supra,* ¶ 105.6.4, pp. 105–102 to 105–103.)

Of course a settlement might give a party a form of relief to which he had no legal or for that matter equitable entitlement. But it is unlikely that the IRS would compromise its generally hard line on tax shelters by incorporating into a settlement agreement a provision that would allow a tax shelter's customer to recompute his original basis on the basis of promissory notes that at the time made were not expected to cost the taxpayer anything.

We are dealing in probabilities, not certainties, but we think it sufficiently improbable that the agreement bears the meaning for which the taxpayers contend to warrant the denial of their request for an evidentiary hearing.

We have not discussed all the contentions of the parties, but we have said enough to indicate the grounds and direction of our thinking. The judgment of the district court must be

AFFIRMED.