In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 06-1756

MICHAEL KELLY, as Administrator of the Estate
of EVERETT KELLY, deceased and PATTI KELLY,

*Plaintiffs-Appellants,*

*v.*

MARTIN & BAYLEY, INC., d/b/a HUCK'S CONVENIENCE
STORE and PHILIP MORRIS INC.,

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Southern District of Illinois.
No. 05 C 409—**David R. Herndon**, *Judge.*

---

ARGUED SEPTEMBER 18, 2006—DECIDED SEPTEMBER 19, 2007

---

Before BAUER and WILLIAMS, *Circuit Judges.*[Œ]

PER CURIAM. Everett Kelly smoked between twenty and
thirty Marlboro Lights cigarettes every day for thirty

---

[Œ] Judge Rovner recused herself after oral argument and has not
participated in the decision of this case. The decision is being
issued by a quorum of the panel. *See* 28 U.S.C. § 46(d).

years and consequently died of lung cancer.[1] Martin & Bayley, Inc. is a corporation that conducts business under the name Huck's Convenience Store ("Huck's") in Madison County, Illinois, where Kelly lived. Huck's sold Marlboro Lights, which were manufactured by the other defendant here, Philip Morris USA, Inc. ("Philip Morris"). Kelly sued Huck's and Philip Morris in the Circuit Court of Madison County, Illinois, alleging that every pack of Marlboro Lights was labeled "Lights" and marked "Lowered Tar and Nicotine," even though Marlboro Lights did not contain any less tar or nicotine than regular Marlboro cigarettes.[2] Instead, Kelly alleged, Marlboro Lights delivered more toxins to smokers than regular Marlboro cigarettes would have delivered. Kelly asserted that Philip Morris knowingly misrepresented the Marlboro Lights product in order to induce smokers like Kelly to switch to Marlboro Lights (when those smokers were otherwise inclined to quit smoking) by causing those smokers to believe they would receive less tar and less nicotine and therefore would reduce the risk of contracting smoking-related illnesses. Kelly's state court suit alleged claims for negligence, product liability, fraud under the Illinois Consumer Fraud and Deceptive Trade Practices Act, breach of express warranty, and breach of implied warranty, all under Illinois law.

Philip Morris preferred to proceed in federal court. The judges and juries of Madison County, Illinois have a

---

[1] Michael Kelly is the son of Everett Kelly and is the administrator of his father's estate. Patti Kelly is Everett Kelly's widow. For the purposes of this opinion, we need not distinguish among them. We will therefore refer to the plaintiffs collectively as "Kelly."

[2] For the purposes of this appeal, the interests of Philip Morris and Huck's are identical and so we will refer to the defendants collectively as Philip Morris.

reputation (in some circles) of being friendly to plaintiffs and hostile to defendants. The county has been designated by the American Tort Reform Foundation as a "Judicial Hellhole®" for defendants for many years.[3] The organization recently upgraded the county's status to "purgatory," noting, though, that "civil defendants still shiver at the prospect of facing a lawsuit in Madison County." *See* Judicial Hellholes 2006, at p. iv. Apparently, Philip Morris, a giant among cigarette manufacturers, a company that has enjoyed the highest revenues, income, volume and market share of any cigarette maker in the United States for each of the last twenty years,[4] shivered at the possibility of facing this suit in Madison County. The company stretched to find a way to remove this state law action to federal court. It settled on 28 U.S.C. § 1442(a)(1), a statute that allows removal to federal court of suits against "The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue." This provision is commonly known as the "federal officer removal statute."

---

[3] The American Tort Reform Foundation is a not-for-profit organization whose stated purpose is to educate the public about how the American civil justice system operates, the role of tort law in that system, and the impact of tort law on the private, public and business sectors of society. Judicial Hellholes® 2006, http://www.atra.org/reports/hellholes/report.pdf, at p. ii (last visited Aug. 29, 2007) (hereafter "Judicial Hellholes 2006"). Its "Judicial Hellholes®" report purports to identify "areas of the country where the scales of justice are out of balance."

[4] The company had net revenues of $18.5 billion in 2006. http://www.philipmorrisusa.com/en/about_us/pm_usa_overview.asp (last visited Aug. 29, 2007).

Philip Morris argued that as a heavily regulated cigarette manufacturer, in testing its cigarettes for tar and nicotine, it was "acting under" an officer of the United States, namely the Federal Trade Commission ("FTC"). The FTC, Philip Morris contended, requires the use of a single test method for measuring cigarette tar and nicotine yields, and has controlled precisely what cigarette manufacturers can and cannot say about the results. The FTC has dictated the testing protocol, established a special test laboratory, conducted the testing itself for more than twenty years, transferred that testing responsibility to a cigarette industry laboratory under continuing FTC supervision, reported the results to Congress and the public as the FTC's own official data, and specified all permissible uses of the test results in cigarette advertising, including the use of descriptors such as "lowered tar and nicotine" and "lights." As a result, Philip Morris argued, the company was acting under a federal officer and was entitled to present its defenses in a more friendly federal court. Philip Morris pointed to a favorable result it received in the Eighth Circuit in a virtually identical case, where plaintiffs brought state court actions against Philip Morris for injuries caused by the plaintiffs' consumption of "light" cigarettes. *See Watson v. Philip Morris Cos.*, 420 F.3d 852 (8th Cir. 2005), *rev'd*, 127 S. Ct. 2301 (2007) (hereafter "*Watson I*"). Philip Morris removed that Arkansas action to federal court using the federal officer statute and the Eighth Circuit affirmed. The district court, relying heavily on the Eighth Circuit's opinion in *Watson I*, denied Kelly's motion to remand to the Madison County court. The district court agreed that Philip Morris was acting under a federal officer in testing and labeling its cigarettes, and found removal was proper under section 1442(a). At the time the instant case was briefed and argued in our court, a petition for certiorari was pending in the Supreme Court for *Watson I*.

The Supreme Court granted the petition for certiorari and unanimously rejected Philip Morris's federal officer argument as being contrary to the statute's language, context, history and purposes. *See Watson v. Philip Morris Cos., Inc.*, 127 S. Ct. 2301, 2305-08 (2007) (hereinafter "*Watson II*"). The Court first considered the history of the federal officer statute, which was enacted near the end of the War of 1812. The Court noted that the war was not popular in New England, where shipowners filed many state-court claims against federal customs officials who were attempting to enforce a trade embargo with England. *Id.* at 2305. The initial version of the federal officer removal statute was enacted in "an attempt to protect federal officers from interference by hostile state courts." *Id.* (quoting *Willingham v. Morgan*, 395 U.S. 402, 405 (1969)). Congress enacted another version of the statute in the early 1830's after South Carolina passed a "Nullification Act declaring federal tariff laws unconstitutional and authorizing prosecution of the federal agents who collected the tariffs." *Id.* Again, the purpose of the removal statute was to allow federal officers a chance to defend themselves in a forum that recognized the authority of federal law in cases where the state courts were hostile to federal law. *Id.*

Shortly after the Civil War, Congress enacted another federal officer removal statute, permitting removal of suits against any federal revenue officer or any person acting under or by authority of a revenue officer on account of any act done under color of office. *Watson II*, 127 S. Ct. at 2305. The statute allowed persons acting under revenue officers to remove cases to federal court only where those persons were engaged in acts for the collection of taxes. *Id.* In 1948, Congress modified the statute by removing the limitation to the revenue context. With the exception of one more modification following the Supreme Court's decision in *International Primate Protection League v.*

*Administrators of Tulane Educational Fund*, 500 U.S. 72 (1991), that 1948 version of the federal officer removal statute remains in effect today. Congress expanded the statute to include all federal officers, but "it nowhere indicated any intent to change the scope of words, such as 'acting under,' that described the triggering relationship between a private entity and a federal officer." *Id.*

After considering the history of the law, the Court then reviewed its own precedent interpreting the various versions of the federal officer removal statute and concluded that the statute's basic purpose "is to protect the Federal Government from the interference with its 'operations' that would ensue were a State able, for example, to 'arres[t]' and bring 'to trial in a State cour[t] for an alleged offense against the law of the State,' 'officers and agents' of the Government 'acting . . . within the scope of their authority.'" *Watson II*, 127 S. Ct. at 2306 (quoting *Willingham*, 395 U.S. at 406). The Court noted that state court proceedings may reflect local prejudice against unpopular federal laws or federal officials, that states hostile to the federal government may impede enforcement of federal law and delay federal revenue collection, and that states might deprive federal officials of a forum in which they could assert federal immunity defenses. *Id.* Some of the same considerations apply to private persons who are assisting federal officials in the execution of their duties. *Id.* at 2307.

The Court then turned to the language of the statute and considered the meaning of "acting under," the part of the statute on which Philip Morris relied in *Watson I* and on which the company relies in the instant case. Looking to the dictionary definition of these words, the Court commented that the phrase "acting under" must refer to a relationship that involves "subjection, guidance, or control." *Watson II*, 127 S. Ct. at 2307. In light of precedent and the purpose of the statute, the Court concluded that "the private person's 'acting under' must involve an effort

to *assist*, or to help *carry out*, the duties or tasks of the federal superior. . . . [T]he help or assistance necessary to bring a private person within the scope of the statute does *not* include simply *complying* with the law." *Id.* (emphasis in original; internal citations omitted). The Court noted that a company complying with federal regulations does not usually face a significant risk of state-court prejudice, and a state-court lawsuit against this sort of company is not likely to prevent federal officials from taking the steps necessary to enforce federal laws. "Nor is such a lawsuit likely to deny a federal forum to an individual entitled to assert a federal claim of immunity." *Id.* at 2307-08. The Court concluded:

> The upshot is that a highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone. A private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase "acting under" a federal "official." And that is so even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored. A contrary determination would expand the scope of the statute considerably, potentially bringing within its scope state-court actions filed against private firms in many highly regulated industries. Neither language, nor history, nor purpose lead us to believe that Congress intended any such expansion.

*Id.* at 2308 (internal citation omitted).

The Court also rejected a number of arguments that Philip Morris raised in *Watson I* and raises again here, but we need not dwell any further on the matter. Philip Morris argued in its brief that the Eighth Circuit reviewed "essentially the same record" that the company presented to the district court here. Brief of Defendants-

Appellees at 2-3. Philip Morris also characterized *Watson I* as "materially identical" to the instant case, *id.* at 24, and stated that Kelly's allegations are "functionally identical" to Watson's, *id.* at 53. Philip Morris also contended that Kelly's complaint is not distinguishable from the complaint in *Watson I. Id.* We accept Philip Morris's concessions that Kelly's case is, for the purposes of jurisdiction, indistinguishable from *Watson I*. Given that the Supreme Court unanimously rejected Philip Morris's materially identical arguments in a functionally identical case where the company presented the courts with essentially the same record, we find the Supreme Court's decision in *Watson II* controlling. We therefore reverse the judgment of the district court and remand the case so that it can be returned to the Madison County court from whence it came.

REVERSED AND REMANDED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

_____