

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-20-1998

# In Re: Jaritz Industries

Precedential or Non-Precedential:

Docket 97-7225

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"In Re: Jaritz Industries" (1998). *1998 Decisions.* Paper 162.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/162

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 20, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NOS. 97-7225 and 97-7226

IN RE: JARITZ INDUSTRIES, LTD.
VICKERS ASSOCIATES, LTD.

v.

JOEL URICE
M.A.F.F., INC. (Intervenor in D.C.)
(D.C. Civil No. 96-3)

IN RE: JARITZ INDUSTRIES, LTD.
d/b/a PENNYSAVER PRINTING, Debtor

M.A.F.F., INC. (Intervenor in D.C.)
(D.C. Civil No. 96-28)

      M.A.F.F., Inc. (Intervenor in D.C.)
       Appellant in No. 97-7225

      Estate of Jaritz Industries, Ltd.
      d/b/a Pennysaver Printing, through
      its Chapter 7 Trustee, John Ellis,
       Appellant in No. 97-7226

On Appeal From the District Court
For the Virgin Islands
(D.C. Civil Action No. 96-cv-00003)

Argued December 9, 1997

BEFORE: SLOVITER, Chief Judge, STAPLETON and
MANSMANN, Circuit Judges

(Opinion Filed July 20, 1998)

Carol A. Rich (Argued)
Campbell, Arellano & Rich
No. 4 A&B Kongens Gade
P.O. Box 11899
Charlotte Amalie, St. Thomas
USVI 00801
 Attorney for Appellant
 Jaritz Industries, Ltd.

Richard R. Knoepfel
Dudley, Clark & Chan
Suite 1
9720 Estate Thomas
Charlotte Amalie, St. Thomas
USVI 00802
 Attorney for Appellant
 M.A.A.F., Inc.

A. Jeffrey Weiss (Argued)
A.J. Weiss & Associates
4002 Raphune Hill Road, Suite 3
Charlotte Amalie, St. Thomas
USVI 00802
 Attorney for Appellee
 Vickers Associates, Ltd.

OPINION OF THE COURT

STAPLETON, Circuit Judge:

We are here asked to review a decision of the District Court of the Virgin Islands in an appeal from an order of a bankruptcy judge sitting in the Virgin Islands by designation of the Third Circuit Judicial Council under 28 U.S.C. S 155. The district court held that section 155 does not authorize the Council to transfer bankruptcy judges temporarily to the Virgin Islands. It concluded that the order appealed from was thus entered without authority and was invalid. We will reverse and remand for further proceedings.

2

I.

Section 155 of Title 28 of the United States Code
provides, in relevant part:

> (a) A bankruptcy judge may be transferred to serve
> temporarily as a bankruptcy judge in any judicial
> district other than the judicial district for which such
> bankruptcy judge was appointed upon the approval of
> the judicial council of each of the circuits involved.

> (b) A bankruptcy judge who has retired may, upon
> consent, be recalled to serve as a bankruptcy judge in
> any judicial district by the judicial council of the circuit
> within which such district is located.

The Honorable Joseph L. Cosetti is a retired bankruptcy
judge of the United States District Court for the Western
District of Pennsylvania. On August 13, 1996, an order was
entered by the Judicial Council of the Third Circuit
memorializing its determination that there was an unmet
need for the services of a bankruptcy judge in the Virgin
Islands and recalling Judge Cosetti, pursuant to S 155(b), to
meet that need.[1]

_____

1. There are two authorized district judge seats in the District of the
Virgin Islands. 48 U.S.C. S 1614. A retirement in October of 1988
resulted in the district's having only one resident judge for the ensuing
14 months. Diane Russell, Some Ethical Considerations of Judicial
Vacancies: A Case Study of the Federal Court System in the United States
Virgin Islands, 5 Geo. J. Legal Ethics 697, 697–98 (1992) (reprinted in
138 Cong. Rec. H8313). The death of the remaining judge in December
of 1989 was followed by a period of two and one-half years during which
there was no resident judge in the district. Id. The two incumbent
district judges were sworn in on June 30, 1992, and May 9, 1994,
respectively. See 981 F. Supp. at XII. During the two years between their
investitures, the district was served by only one resident judge. Thus,
the district was severely understaffed for a period of over five and a
half
years. In these circumstances, the development of a backlog was
inevitable; intolerable delays were threatened.

The Judicial Council of the Third Circuit dealt with this crisis by
transferring judges from other districts to help service the Virgin
Islands
workload. District judges from elsewhere in the Third Circuit and beyond
were transferred under 28 U.S.C. S 292. In addition, beginning on April
1, 1990, a New Jersey bankruptcy judge was transferred pursuant to 28

3

Jaritz Industries, Ltd. ("Jaritz"), a printing and copying business, filed for Chapter 11 bankruptcy in the District Court of the Virgin Islands. The case was referred to Judge Cosetti pursuant to the district court's standing order of reference. Joel Urice, the owner of Jaritz, had purchased the business from Vickers Associates, Ltd. ("Vickers") in return for an 8-year note that called for two large balloon payments at the end of the term. Jaritz sought bankruptcy protection primarily due to its inability to make the first of these balloon payments to Vickers.

Several months after the bankruptcy proceedings began, A. Jeffrey Weiss entered an appearance as counsel for Vickers. Over the next few months, Weiss filed numerous frivolous and duplicitous motions and appeals, and his unprofessional conduct ultimately resulted in the entry of a sanction order by Judge Cosetti. On appeal, the district court sustained Judge Cosetti's order sanctioning Weiss and Vickers, and then directed Weiss and Vickers to show cause why the district court should not invoke its inherent power to impose additional sanctions for their conduct during the appeal.

Prior to the return date of the order to show cause, the district court sua sponte raised and requested briefing on

_____

U.S.C. S 155(a). Judge Cosetti relieved him in January of 1992. Following Judge Cosetti's retirement in 1994, he was recalled under 28 U.S.C. S 155(b) for duty in the Virgin Islands, the District of New Jersey, the Eastern District of Pennsylvania, and the Western District of Pennsylvania. His authority to sit in the Virgin Islands was continued through two subsequent recalls.

This transfer program has been successful. On December 31, 1989, there were 1400 civil cases, 395 criminal cases, and 209 bankruptcy cases pending in the District Court of the Virgin Islands. Administrative Office of the United States, Federal Judicial Workload Statistics 26, 36, 58 (Dec. 31, 1990). By March 31, 1996, several months before the order issued in this case, there were 873 civil cases, 164 criminal cases, and 137 bankruptcy cases pending in the district. Administrative Office of the United States, Federal Judicial Caseload Statistics 31, 52, 100 (Mar. 31, 1996). While the backlog had been substantially reduced, the two district judges still had a substantial need for assistance with the bankruptcy workload.

4

the issue of its jurisdiction to hear appeals from orders of a U.S. bankruptcy judge under 28 U.S.C. S 158(a). The court ultimately concluded that it had "jurisdiction to review the order of a bankruptcy judge who would be properly authorized by statute to act as a judicial officer of the District Court of the Virgin Islands." In re Jaritz Indus., 207 B.R. 451, 453 (D.V.I. 1997). The court held, however, that section 155 authorizes temporary transferring of bankruptcy judges only to Article III district courts, that Judge Cosetti accordingly lacked authority to sit on the District Court of the Virgin Islands, an Article I court, and that "there simply [was] no such valid order to review in this case." Id. The district court viewed Judge Cosetti's lack of authority as depriving it of subject matter jurisdiction and dismissed the appeal. Shortly thereafter, the court entered an order withdrawing its standing order of reference. Jaritz timely appealed, and we have jurisdiction pursuant to 28 U.S.C. SS 1291 and 1294(3). The issue in this appeal is a question of law over which this court exercises plenary review. Epstein Family Partnership v. Kmart Corp., 13 F.3d 762, 765-66 (3d Cir. 1994).

II.

Bankruptcy Judge Cosetti imposed sanctions on Vickers and Weiss pursuant to Fed. R. Bankr. P. 9011, which provides for sanctions parallel to those specified in Fed. R. Civ. P. 11. In Willy v. Coastal Corp., 503 U.S. 131 (1992), the Supreme Court held that a district court has jurisdiction to impose Rule 11 sanctions on litigants and attorneys appearing before it even if the court is subsequently determined to lack subject matter jurisdiction over the case in which the sanctionable conduct occurred. While acknowledging that "[a] final determination of lack of subject-matter jurisdiction of a case in a federal court, of course, precludes further adjudication of it," the Court nonetheless clarified that "such a determination does not automatically wipe out all proceedings had in the district court at a time when the district court operated under the misapprehension that it had jurisdiction." Id. at 137.

The Court explained that "maintenance of orderly procedure" provided sufficient grounds to justify an

imposition of non-case dispositive sanctions "even in the wake of a jurisdiction ruling later found to be mistaken." Id. Although parties may eventually seek appellate review of a court's invocation of jurisdiction over their dispute, they are required to demean themselves appropriately before that court while awaiting that appeal:

> The interest in having rules of procedure obeyed. . . does not disappear upon a subsequent determination that the court was without subject-matter jurisdiction. Courts do make mistakes . . . . But . . . there is no constitutional infirmity under Article III in requiring those practicing before the courts to conduct themselves in compliance with the applicable procedural rules in the interim, and to allow the courts to impose Rule 11 sanctions in the event of their failure to do so.

Id. at 139.

We recognize that the validity of Judge Cosetti's sanction orders poses a somewhat different issue than that posed in Willy. The authority of the sanctioning judge to sit in his district was not challenged in Willy. Nevertheless, we believe that the principles found controlling in Willy must control here. Judge Cosetti was a duly appointed judge with the authority to exercise the judicial power of the United States in bankruptcy matters. He was sitting in the District of the Virgin Islands, rather than his home district, pursuant to a duly adopted resolution of the Judicial Council of the Third Circuit. He exercised judicial power over this particular controversy by virtue of a standing order of the district court and without protest from Vickers or Weiss. Both he and the litigants had a substantial interest in the proceedings being conducted in an orderly manner. Just as in Willy, Judge Cosetti's and the litigants' interests in having rules of procedure obeyed did not disappear upon the subsequent determination of the district court that Judge Cosetti lacked jurisdiction. By the same token, Vickers and Weiss were and are obligated to conduct themselves appropriately in these proceedings unless and until it is finally determined that the apparent authority of Judge Cosetti is invalid.

6

It follows that the district court was in error when it concluded that Judge Cosetti's sanction order was invalid because it was issued without jurisdiction. It also follows, in our view, that the district court had appellate jurisdiction to review that order and that any sanctions which the district judge might have imposed as a result of improper conduct during the appellate proceedings would have to be sustained by us without reference to our determination regarding the validity of the Circuit Council's transfer order. See In re Orthopedic "Bone Screw" Prod. Liab. Litig., 132 F.3d 152, 156 (3d Cir. 1997).

Under normal circumstances, we would conclude our analysis here. The foregoing discussion therefore provides adequate support for our mandate. Nonetheless, the district court's opinion expresses the view that any bankruptcy judge transferred to the Virgin Islands by the Circuit Council lacks authority to adjudicate any bankruptcy matters there, and this view has resulted in the withdrawal of the district's standing order of reference. This has substantially burdened the administration of bankruptcy in the Virgin Islands. Because the issue is of such significance and the parties have briefed it extensively, we pursue our discussion of whether Judge Cosetti was properly authorized to hear bankruptcy matters in the Virgin Islands.

III.

The specific issue for decision here is a narrow one: what did Congress intend when it used the term "judicial district" in section 155. Did it use the term in a generic sense to refer to the geographic area in which a district court exercises judicial authority in bankruptcy matters, or did it intend its scope to be limited to the geographic area in which an Article III district court exercises judicial authority over such matters. If Congress intended the former, section 155 authorizes transfers of bankruptcy judges to serve in the district in which the District Court of the Virgin Islands exercises bankruptcy jurisdiction. If Congress intended the latter, section 155 provides no such authority.

7

The Bankruptcy Amendments and Federal Judgeship Act
of 1984 effected a comprehensive reorganization of our
bankruptcy system in the wake of the Supreme Court's
decision in Northern Pipeline Construction Co. v. Marathon
Pipe Line, 458 U.S. 50 (1982), finding the jurisdictional
provisions of the Bankruptcy Reform Act of 1978
unconstitutional. Chapter 6 of Title 28, as amended by the
1984 Act, specifies the character and operation of the
reorganized system. The transfers authorized by section
155 are an integral part of that Chapter and of that
reorganized system.

We find nothing in the text of section 155 that limits its
scope to judicial districts having an Article III district court.
Similarly, we find nothing in the text of Chapter 6 that, as
a matter of textual analysis, so limits the scope of that
section. Finally, we find nothing in the very sparse
legislative history of the 1984 Act that suggests an intent to
restrict the authorization conferred by section 155 to Article
III districts. Thus, consideration of the text and legislative
history of Chapter 6 alone would tend to support the view
that "judicial district" was intended to include any district
in which judicial authority over bankruptcy matters is
exercised. We would, of course, be remiss however if we
decided this statutory construction issue without
considering the purpose of section 155 and its place in the
scheme of Chapter 6. Accordingly, we inquire whether the
broader or the narrower reading of "judicial district" will
best serve Congress's objectives in enacting Chapter 6 and
section 155 in particular.

The overall objective of Chapter 6 was to create a
reorganized bankruptcy system in which a specialized corps
of full-time bankruptcy judges would assist district court
judges in adjudicating bankruptcy matters in a manner
consistent with the teachings of Marathon. It is evident
from the face of section 155 that its objective was the
efficient and effective use of that corps of full-time
bankruptcy judges. Congress was aware from past
experience that the demand for bankruptcy services in any
given district would ebb and flow in response to the
economic conditions in the district, and that the supply of
judge power in each district to provide such services would

ebb and flow depending on such things as the number of district judge and bankruptcy judge vacancies. Moreover, Congress determined not to provide the new system with part-time bankruptcy judges, and it must have been aware that there would be periods when the bankruptcy workload in a district would be substantial enough to be difficult to service, but nevertheless not yet large enough to warrant the appointment of a full-time bankruptcy judge. In this context, the new system would be efficient and effective only if someone were given the authority to match demand with judge power by transferring bankruptcy judges to districts where the regularly assigned judicial officers were overloaded. This matching authority was appropriately conferred on the judicial councils of the circuits, which had earlier been directed to "make all necessary and appropriate orders for the effective and expeditious administration of justice within [their circuits]." 28 U.S.C. S 332(d)(1).

Having identified the evident purpose of section 155, we turn to the overall statutory scheme of Chapter 6 to determine if there is any reason Congress might have wished to garner the efficiencies provided by that section for judicial districts having an Article III district court and not for judicial districts having an Article I district court which exercises the jurisdiction of an Article III court by virtue of the legislation that created it. We perceive no such reason. To the contrary, our review of the statutory scheme has convinced us that Congress intended the new bankruptcy system to operate in the Virgin Islands in the same manner it was to operate in an Article III district under comparable circumstances.

Under the new system, the district courts retained their original subject matter jurisdiction in bankruptcy cases. This included both district courts created by Congress under Article III of the Constitution as well as territorial courts created by Congress under Article I which, like the District Court of the Virgin Islands, were authorized to exercise the subject matter jurisdiction of Article III district courts. Thus, the judges of the District Court of the Virgin Islands, like all United States district judges, are authorized to adjudicate bankruptcy cases.

As we have noted, the 1984 Act created a corps of full-time bankruptcy judges to assist district judges with the bankruptcy workload. These judges were to be appointed in the manner set forth in 28 U.S.C. S 152. Subsections 152(a)(1) and (2) reflect a determination by Congress that the then current bankruptcy workload of each Article III district court justified one or more full-time bankruptcy judges. They establish the number of bankruptcy judge seats for each such district and direct that the judgeships thus authorized be filled by the United States Court of Appeals for the appropriate circuit. Subsection 152(a)(4), on the other hand, reflects a determination by Congress that the bankruptcy workload of the territorial district courts did not yet warrant a full-time bankruptcy judge in any such district.

Most importantly for present purposes, however, subsection 152(a)(4) also reflects an anticipation on the part of Congress that this situation would change and that full-time bankruptcy judges would be needed in one or more of the Article I courts in the future. Subsection 152(a)(4) directs that the district judges of the territorial courts will handle the bankruptcy work for the present but goes on to authorize the United States Court of Appeals for the circuit within which a territorial district court is located to fill full-time bankruptcy seats for the judicial district as they are created by Congress. Finally, subsection 152(b)(2) directs that the Judicial Conference monitor the need for full-time bankruptcy judges and periodically submit to Congress its recommendations "regarding the number of bankruptcy judges needed and the districts in which such judges are needed." In this way, Congress would be in a position, when the need arose, to increase the number of full-time bankruptcy judge seats in Article III districts as well as to create new full-time bankruptcy seats in the Article I districts.

Section 157 of the Act, which spells out the jurisdiction of bankruptcy judges and their relationships to the judges of the district courts, is not limited by its text to the Article III courts listed in subsection 152(a)(2). Rather, that text is drafted in such a way that once bankruptcy judges are available to assist the judges of a district court of a

territory, the system will work in the same fashion in that district as in other districts with initially authorized bankruptcy judge seats. Section 157(a), for example, stipulates that "[e]ach district court may provide that any or all cases [, arising under, arising in, or related to a case under] title 11 shall be referred to the bankruptcy judges for the district." It was this provision under which the district court of the Virgin Islands entered its general order of reference. We believe that order was fully consistent with the wording and intent of section 157.

Finally, note should be taken of section 158, which governs appeals from final and interlocutory orders of bankruptcy judges in proceedings referred to them under section 157. With one exception not here relevant, section 158 provides that "[t]he district courts of the United States shall have jurisdiction to hear appeals from final. . . orders . . . and with leave of the court, from . . . interlocutory orders . . . of bankruptcy judges," and that an appeal to a circuit court is permissible only after that jurisdiction has been exercised. In In re Kool, Mann, Coffee & Co., 23 F.3d 66 (3d Cir. 1994), we held that, because the district court of the Virgin Islands exercises all of the jurisdiction of a district court of the United States under 48 U.S.C. S 1612(a), section 158(a) applies to orders of a bankruptcy judge sitting in its judicial district and forecloses an appeal from such an order directly to this court. Implicit in our decision in Kool, Mann is the view that Congress anticipated that the new bankruptcy system would function in the Virgin Islands in the same way it would function in other judicial districts having Article III courts in comparable circumstances.

Based on our review of Chapter 6 of Title 28, the following relevant propositions seem to us indisputable: (1) Congress intended bankruptcy matters to be adjudicated in the District Court of the Virgin Islands; (2) Congress determined that bankruptcy judges would assist the judges of that district when there was a sufficient workload to warrant a full-time bankruptcy judge, and the bankruptcy system would thereafter function in that district in the same manner as in Article III districts; and (3) Congress intended the Judicial Council of the Third Circuit to make

11

the most effective and efficient use of district judge and bankruptcy judge power in the circuit by temporarily transferring bankruptcy judges so as to match the need for bankruptcy services in a district with the judge power available there. The remaining issue is whether Congress intended to foreclose the Judicial Council of the Third Circuit from acting to meet an unserved need for bankruptcy services in the Virgin Islands by temporary transfer prior to the time when the bankruptcy workload is of sufficient size and consistency to warrant the creation of a full-time bankruptcy judge seat for the District Court of the Virgin Islands. Having considered this issue, we now make explicit what we believe is implicit in our decision in Kool, Mann: We conclude that the 1984 Act evidences no Congressional intent arbitrarily to defer the flexibility and thus the efficiency provided by section 155 in this manner. Accordingly, we respectfully disagree with the district court's reading of that section.

We have thus far confined our discussion to an analysis of the text and legislative history of the relevant portions of the 1984 Act. As we have indicated, that analysis supports the conclusion that "judicial district" in Section 155 includes the judicial districts of Article I courts. As Weiss and Vickers stress, however, the relevant portions of the 1984 Act have been codified as a part of Title 28 of the United States Code, and cognizance of that context should be taken when interpreting section 155. Section 451 of Title 28 contains a set of definitions that apply to terms "[a]s used" throughout Title 28. Section 451 provides that the term "judicial district" as used in Title 28 refers to "the districts enumerated in Chapter 5" of Title 28, the chapter that creates Article III district courts. Section 451 can thus be cited in support of a conclusion that the authority conferred by section 155 is limited to transfers to judicial districts having Article III district courts. The definitions of section 451 were codified 36 years before the adoption of the 1984 Act, however, and are definitions for general application throughout all 53 chapters of Title 28. While we, of course, recognize that a definitional section like section 451 must presumptively be taken as reflecting the Congressional intent when a defined term is used even in subsequent legislation, it is not controlling where

12

consideration of the term's immediate context and its place in the overall Congressional scheme clearly indicate that it is being used not as a defined term of art but in its commonly understood sense.

We find the situation before us much like that before the Supreme Court in International Longshoremen's & Warehousemen's Union v. Juneau Spruce Corp., 342 U.S. 237 (1952). There, the ILWU had sued Juneau Spruce for alleged violations of the Labor Management Relations Act in the District Court for the Territory of Alaska. Section 303(b) of the LMRA authorized suit for violations of its provisions "in any district court of the United States." When it addressed the issue of the district court's jurisdiction, the Supreme Court acknowledged that "[t]he words `district court of the United States' commonly describe constitutional courts created under Article III of the Constitution, not the [Article I] courts of the Territories." Id. at 241. Indeed, those words were so defined at the time by section 451 of Title 28. The Court went on to suggest that there was another less common but permissible reading of those words, however, in the context of a district court, like the District Court for the Territory of Alaska, that is authorized to exercise the jurisdiction of an Article III court. The Supreme Court resolved the ambiguity by reference to the context in which the words were used and the purpose of the congressional scheme.

The Court noted that the jurisdictional grant in section 303(b) removed the jurisdictional limitations of amount in controversy and citizenship of the parties, defined the capacity of labor unions to sue or be sued, restricted the enforceability of money judgments against the assets of labor unions, specified the jurisdiction of district courts over unions, and defined the requirements of service of process. The Court reasoned that these provisions reflected Congress's design in passing the LMRA to reshape labor-management relations. Part of this design was to remove obstacles to suit in federal courts, and the District Court for the Territory of Alaska was the only court in Alaska with federal jurisdiction to which the Union could seek recourse. Id. at 242. The Court concluded as follows:

13

> [S]ince Congress lifted the restrictive requirements
> which might preclude suit in courts having the district
> courts' jurisdiction, we think it is more consonant with
> the uniform, national policy of the Act to hold that
> those restrictions were lifted as respects all courts
> upon which the jurisdiction of a district court has been
> conferred. That reading of the Act does not, to be sure,
> take the words `district court of the United States' in
> their historic, technical sense. But literalness is no
> sure touchstone of legislative purpose. The purpose
> here is more closely approximated, we believe, by giving
> the historic phrase a looser, more liberal meaning in
> the special context of this legislation.

Id. at 242-43.

We believe the teachings of Juneau Spruce counsel a
liberal interpretation of section 155 based on its underlying
context and purpose. Congress enacted a uniform, national
policy of bankruptcy administration in the 1984 Act, and
section 155 of that Act was designed to facilitate efficient
use of judicial resources. Congress inserted section 155
into the 1984 Act so that the circuit judicial councils could
allocate bankruptcy judges among the "judicial districts" in
which bankruptcy cases are adjudicated. Although the term
"judicial district" as defined elsewhere in the Judicial Code
refers only to the specifically enumerated district courts,
the purpose of section 155 -- ensuring maximally efficient
use of judicial resources -- is "more closely approximated"
by a more pragmatic and flexible construction of that term.

IV.

Even if we were persuaded that section 451 limits the
scope of section 155, and that the latter section,
accordingly, does not reflect an affirmative decision by
Congress to authorize temporary transfers of bankruptcy
judges to judicial districts of Article I courts, our ultimate
resolution of the issue before us would be the same.
Section 332(d)(1) of Title 28 of the United States Code
directs that "[e]ach judicial council shall make all necessary
and appropriate orders for the effective and expeditious
administration of justice within its circuit," and section

14

332(d)(2) orders that "[a]ll judicial officers and employees of the circuit shall promptly carry into effect all orders of the judicial council." The text of this provision and its legislative history convince us that it authorizes circuit councils to take any administrative action that will promote the effective and expeditious administration of justice in their circuits, so long as the action is not inconsistent with rules and policies Congress has previously established in statutes regulating the affairs of the federal judiciary.

The temporary transfer of a duly appointed bankruptcy judge to a judicial district of an Article I court to service the bankruptcy workload in that district is clearly an administrative action designed to promote the effective and expeditious administration of justice in the circuit. Given our previously stated conclusions that Congress (1) has determined in 48 U.S.C. S 1612(a) that bankruptcy cases will be adjudicated in the Virgin Islands, (2) has approved in section 152(a)(4) the use of bankruptcy judges to assist the district judges of the Virgin Islands in servicing the bankruptcy load, and (3) has endorsed in section 155(a) a policy favoring temporary transfer of bankruptcy judges to match the demand for bankruptcy services with available judge power, we conclude that Judge Cosetti's transfer to the Virgin Islands by the Third Circuit Judicial Council was authorized by 28 U.S.C. S 332(d).

It is apparent from the text of section 332(d) and from its legislative history that it was intended to charge circuit councils with the responsibility of assuring the prompt and efficient administration of justice in their circuits. This charge included an express mandate that they were to initiate any and all actions necessary to provide that assurance. The authority conferred was neither restricted nor discretionary. That authority was clearly broad enough to encompass the action taken by the Circuit Council here.

The Honorable Emanuel Celler was a member of the House Committee on the Judiciary when section 332(d) was debated and enacted in 1939. Two decades later, as Chairman of that Committee, he had occasion to canvass and comment upon the relevant legislative history of that provision and the ensuing experience of his Committee. Judicial Conference of the United States Report on the

15

Powers and Responsibilities of the Judicial Councils, H.R.
Doc. No. 87-201, at v-vi (1961). Chairman Celler
characterized S 332(d) as conferring on the circuit councils
"all-inclusive responsibility for court management and
judicial administration." Id. at v. He went on to make the
following observations concerning the legislative intent:

> . . . [I]t was the intention of the Congress to charge the
> judicial councils of the circuits with the responsibility
> for doing all and whatever was necessary of an
> administrative character to maintain efficiency and
> public confidence in the administration of justice. . . .
>
> The language of title 28, United States Code, section
> 332 was recommended to the Congress in 1939 by the
> judges themselves and was deliberately worded in
> broad terms in order to confer broad responsibility and
> authority on the judicial councils. It was the
> considered judgment of the Congress that the judicial
> councils were by their very nature the proper agents
> for supervising management and administration of the
> Federal courts. The councils are close to all the courts
> of the circuit and know their needs better than anyone
> else and, by placing responsibility and authority in the
> councils of the circuits, administrative power in the
> judicial branch was decentralized, as it ought to be,
> and in each circuit kept in the hands of judges of the
> circuit.
>
> * * *
>
> In past years many problems have been called to the
> attention of the Committee on the Judiciary which, in
> my judgment, should have been settled by the judicial
> council of the circuit and need never have been
> brought to the attention of the Congress if the judicial
> council had met the responsibility and exercised the
> powers conferred upon it by the Congress. I will
> mention only one example.
>
> The Congress is not infrequently importuned to
> create additional judicial districts and divisions. Most
> of these demands originate from inadequate judicial
> service in the localities concerned. Nearly all of them
> could and should be remedied by action of the judicial

16

council of the circuit in arranging and planning judicial assignments to provide an equitable distribution of the judgepower of the circuit.

As these remarks suggest, the primary criticism of the courts that had been brought to the attention of Congress in 1939 concerned delay in the administration of justice. See S. Rep. No. 76-426, at 2-4 (1939). One of the responses that Congress expressly expected the new judicial councils to adopt was the matching of need for judicial services and judge power through inter-district assignment. In his concurrence in Chandler v. Judicial Council of the Tenth Circuit, 398 U.S. 74 (1970), Justice Harlan undertakes an exhaustive analysis of the legislative background of section 332. Quoting the testimony of Chief Justice Groner, who "shouldered most of the task of explaining the purposes of the bill to the committees of both Houses of Congress," id. at 99, Justice Harlan observes that section 332 was designed to empower the judicial councils to take a variety of ameliorative actions, including "if the statistics showed a particular district court to be falling behind in its work, [action by] the Council [to] `see to it . . . that assistance is given to him whereby the work may be made current.' " Id. at 100 (quoting Hearings on S.188 before a Subcomm. of the Senate Comm. on the Judiciary, 76th Cong. 11 (1939)). Circuit Judge Parker testified similarly before the House Judiciary Committee, predicting that the councils could explain to districts whose dockets had fallen into arrears that they "will send Judge Smith into your district and he will assist you in holding court in your district until this arrearage is cleared up." Id. at 100 n. 7 (quoting Hearings on H.R. 5999 before the House Comm. on the Judiciary, 76th Cong. 20-21 (1939)) (internal quotation marks omitted).[2]

_____

2. The current provision authorizing inter-district transfers of district judges, 28 U.S.C. S 292, was not in existence in 1939. Section 17 of Title 28 of the United States Code of 1927, as it existed in 1939, provided:

Whenever any district judge by reason of any disability or necessary
absence from his district or the accumulation or urgency of
business is unable to perform speedily the work of his district, the
senior circuit judge of that circuit, or, in his absence, the circuit
justice thereof, may, if in his judgment the public interest requires,

We believe these portions of the legislative history demonstrate that when the Third Circuit Judicial Council entered its order temporarily transferring Judge Cosetti to the Virgin Islands to assist with the bankruptcy workload there, it was doing precisely what Congress intended to authorize and require when it adopted S 332(d). In the words of Chairman Celler, it was "arranging and planning judicial assignments to provide an equitable distribution of the judgepower of the circuit." Thus, even were we persuaded that section 155 did not affirmatively authorize Judge Cosetti's transfer, we would sustain his authority to sit in the Virgin Islands under section 322(d).

V.

The order of the district court dismissing the appeal before it for want of jurisdiction will be reversed, and this matter will be remanded to the district court so that it may affirm Judge Cosetti's sanction order and determine whether additional sanctions are appropriate based on conduct occurring before it during the appeal.

_____

designate and assign any district judge of any district court within the same judicial circuit to act as district judge in such district and to discharge all the judicial duties of a judge thereof for such time as the business of the said district court may require.

Section 332(d) was viewed as supplementing the authority thus conferred.

18

SLOVITER, Circuit Judge, joining in Parts I, II, and IV of the majority's opinion and concurring in the result.

Were I a member of Congress, I would willingly vote to support a statute with the provisions that my colleagues read into section 155 of title 28. But I do not join Part III of Judge Stapleton's opinion because we have the obligation to construe the text of a statute according to its terms, even if we believe that it is likely that Congress made an inadvertent omission. This is particularly so when the language of the statute literally applied, reaches a coherent, albeit undesired, result. Like the district court, I "reluctantly" must conclude that the Bankruptcy Amendments and Federal Judgeship Act of 1984 does not authorize the temporary transfer of bankruptcy judges to the district courts of the Virgin Islands.

The relevant statutory language provides that "[a] bankruptcy judge may be transferred to serve temporarily as a bankruptcy judge in any judicial district other than the judicial district for which such bankruptcy judge was appointed. . . ." 28 U.S.C. S 155(a) (emphasis added). Both the majority and the district court have correctly framed the statutory question as "what did Congress intend when it used the term `judicial district' in section 155." Maj. op. at 7. And as both the district court and the majority have recognized, that term is expressly defined. Section 451 of title 28 provides that "[a]s used in this title . . . [t]he term `district' and `judicial district' mean the districts enumerated in Chapter 5 of this title." 28 U.S.C. S 451 (emphasis added). In turn, chapter 5 of title 28 creates 91 enumerated judicial districts, including one for the District of Puerto Rico, but not for the Virgin Islands. See 28 U.S.C. SS 81-131.

The Supreme Court has emphasized that

> in interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: "judicial inquiry is complete."

19

Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253–54 (1992) (citations omitted) (declining to adopt interpretation of section of the Bankruptcy Amendments and Federal Judgeship Act of 1984 that was inconsistent with pre-existing section of title 28). The text at issue before us admits of no ambiguity. Accordingly, we must assume that Congress meant for the term "judicial district" in section 155 to refer only to those districts enumerated in chapter 5 of title 28. Because the Virgin Islands is not one of those districts, I am compelled to conclude that section 155 does not authorize the temporary transfer of a bankruptcy judge to the Virgin Islands.

The majority does not purport to have discovered an ambiguity in any of the statutes relevant to its decision. Rather, they contend that the definitions contained in section 451 are not controlling as they only "presumptively" reflect congressional intent. Significantly, the only authority that the majority cites in support of its interpretive technique is International Longshoremen's & Warehousemen's Union v. Juneau Spruce Corp., 342 U.S. 237 (1952). There, the Court was called upon to determine whether the phrase "district court of the United States" as used in section 303(b) of the LMRA included the then-territorial court of Alaska. After noting that the phrase "district court of the United States" "commonly describe[s] constitutional courts created under Article III of the Constitution" as opposed to the territorial courts, the Supreme Court reasoned that the context and purpose of the LMRA required a broader definition. Id. at 241 (emphasis added). Significantly, the language at issue there was not defined in the LMRA nor was it subject to the definitional sections of title 28. Thus, with no explicit direction from Congress, the Court declined to apply the "historic" definition of the phrase "district court of the United States" and, instead, adopted one more in keeping with the national policy underlying the LMRA. Id. at 243.

In contrast, Congress has expressly defined the term "judicial district" as it appears in section 155 and elsewhere throughout title 28. As such, we are not at liberty, as was the Court in Juneau Spruce, to fashion a definition which, in this court's view, better serves the legislative purpose.

20

Where Congress has made its intention explicit in the text of the statute, we are bound to follow its clear instruction. It is pure conjecture for the majority to presume that Congress did not realize that by placing section 155 within title 28 it would be subject to that title's definitional provisions.

Of course, I agree with the majority that one of the purposes underlying the 1984 Act was "to facilitate efficient use of judicial resources." Maj. op. at 14. It does not follow that Congress intended to enact every provision that would enhance judicial efficiency. Admittedly, one of Congress's overarching objectives was to facilitate the efficient distribution of judicial resources, but the unambiguous means by which Congress chose to advance that objective was to authorize the temporary transfer of bankruptcy judges to the 91 "judicial districts" enumerated in chapter 5 of title 28. Our belief that other transfers would also facilitate efficient use of judicial resources cannot drive our analysis.

I conclude, therefore, that section 155 did not authorize the transfer of Judge Cosetti to the Virgin Islands. As such I cannot join in Part III of the majority's opinion.

I do, however, agree with the majority that 28 U.S.C. S 332(d)(1) invested the Judicial Council with the authority to effect the transfer. Thus, to the extent that I, in my capacity as Chief Judge of the Third Circuit, signed the orders on behalf of the Judicial Council designating and assigning Judge Cosetti to the District of the Virgin Islands under the authority of 28 U.S.C. S 155(a), repeating the language used by my predecessor in entering similar orders, I believe I erred in the statutory reference, although I believe that the Judicial Council clearly had the authority to assign Judge Cosetti under 28 U.S.C. S 332(d)(1), given the need for his service. Accordingly, I concur in the judgment of the court.

21

MANSMANN, Circuit Judge, concurring.

While I agree with the general principles expounded by the majority and the majority's ultimate resolution of the issues presented, I write separately to clarify what for me are the essential policy considerations that weigh in favor of the result reached.

I.

The central issue we are called upon to decide is whether the temporary transfer provision of the Bankruptcy Amendments and Federal Judgeship Act of 1984 ("BAFJA"), confers upon the Third Circuit Judicial Council the authority to assign a United States bankruptcy judge temporarily to the United States District Court for the District of the Virgin Islands. Specifically, we must determine whether Congress intended the term "judicial district" as used in section 155(a) of the BAFJA to include territorial districts such as the Virgin Islands.1

A.

Our starting point, as with any case construing a statute, is the language of the statute itself. Robinson v. Shell Oil Co., 117 S. Ct. 843, 846 (1997); International Primate Protection League v. Administrators of Tulane Educ. Fund, 500 U.S. 72, 79 (1991). As always, we interpret the language of the BAFJA by reference to the language itself, the specific context in which the language is used, and the broader context of the BAFJA as a whole. Robinson, 117 S. Ct. at 846. In addition, we interpret the BAFJA in a manner which best effectuates Congressional intent and the legislative purpose underlying its adoption. International

_____

1. Section 155(a) of the BAFJA provides as follows:

> A bankruptcy judge many be transferred to serve temporarily as a bankruptcy judge in any judicial district other than the judicial district for which such bankruptcy judge was appointed upon the approval of the judicial council of each of the circuits involved.

28 U.S.C. S 155 (a)(1994)(emphasis added).

22

Longshoremen's & Warehousemen's Union v. Juneau Spruce Corp., 342 U.S. 237, 241-43 (1952).

As noted by the majority, the BAFJA was enacted to respond to the United States Supreme Court's decision in Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50 (1982), holding that Congress' broad grant of jurisdiction to non-Article III bankruptcy judges was unconstitutional. In July 1984, Congress passed the BAFJA in order to create a nationwide, comprehensive judicial bankruptcy system that complied with Northern Pipeline.

In the interim period between Northern Pipeline and the enactment of the BAFJA, the courts enacted emergency rules that complied with Northern Pipeline to govern the operation of the bankruptcy courts until Congress acted. See Jean K. FitzSimon and Andrea J. Winkler, Legislative History of the Bankruptcy Amendments & Federal Judgeship Act of 1984, Collier on Bankruptcy, App. Vol. E, Pt. 6-87, 6-99 (15th ed. 1997). The emergency rules were held to be justified in order to avoid inundating the district courts with bankruptcy cases when an entire system of bankruptcy judges with specialized knowledge and expertise was already in place. In re Stewart, 741 F.2d 127, 132 n.6 (7th Cir. 1984).

In upholding the constitutionality of one such emergency rule, our sister court of appeals for the Second Circuit offered the following insight into the purpose and policy behind establishing bankruptcy courts:

> There are also strong policy reasons for allowing bankruptcy judges to enter final judgments in traditional bankruptcy disputes. First, the practice eliminates the need for the district courts to enter every bankruptcy case at the beginning. District courts are thus free to attend to other matters on their crowded calendars, giving all litigants a better opportunity to have their day in court. Second, all cases are not appealed. There should be at least one adjudication made by a judge with expertise in bankruptcy law.

In re Kaiser, 722 F.2d 1574, 1581 (2d Cir. 1983). The BAFJA enacted by Congress in 1984 was based largely upon the emergency rules adopted by the courts.

23

B.

Section 152(a) of the BAFJA provides for the appointment of numerous bankruptcy judges for the "several judicial districts" in the states listed in section 152(a)(2). In addition, the BAFJA includes the following provision relating to the establishment of bankruptcy judges in territories such as the Virgin Islands:

> The judges of the district courts for the territories shall serve as the bankruptcy judges for such courts. The United States court of appeals for the circuit within which such a territorial district court is located may appoint bankruptcy judges under this chapter for such district if authorized to do so by the Congress of the United States under this section.

28 U.S.C. S 152 (a)(4)(1994). We have not appointed a bankruptcy judge to the Virgin Islands under this provision because Congress has yet to authorize such an appointment.

As the initial BAFJA provision establishing a bankruptcy system for the territories, section 152(a)(4) is central to our analysis of whether Congress intended the term "judicial district" to encompass the Virgin Islands. By using the phrase "for such district" in this section, Congress expressed its intention to include the territories when employing the term "district." Because the terms "district" and "judicial district" are used interchangeably within the BAFJA and because the word "judicial" has no limiting connotation in connection with courts in the territories, Congress' clear expression that the term "district" includes the Virgin Islands extends equally to the term "judicial district." See generally 28 U.S.C. S 156 (1994)(discussing appointment of law clerks for bankruptcy judges and using the term "district" in section 156(f) and"judicial district" in section 156(e) interchangeably).2

This interpretation of the terms "judicial district" and "district" is consistent with their use in the BAFJA as a

_____

2. The fact that Congress has traditionally defined the terms "district" and "judicial district" as synonyms further supports this conclusion. See 28 U.S.C. S 451 (1994).

24

whole. If Congress were to authorize and we were to appoint a bankruptcy judge to the Virgin Islands as contemplated by section 152(a)(4), only our interpretation of these terms would give the statute the meaning Congress intended. For example, section 158 which governs appeals from bankruptcy judge decisions provides that appeals "shall only be taken to the district court for the judicial district in which the bankruptcy judge is serving." This section contemplates that a decision by a duly authorized and appointed Virgin Islands bankruptcy judge may only be appealed to the District Court of the Virgin Islands. See In re Kool, Mann, Coffee & Co., 23 F.3d 66, 67–68 (3d Cir. 1994)(holding that section 158 requires that an appeal from a bankruptcy judge sitting by designation in the Virgin Islands must be taken to the district court).

If we were to interpret the term "judicial district" as excluding the Virgin Islands, the BAFJA would contain no provision to govern direct appeals from a Virgin Islands bankruptcy judge. In light of the fact that Congress undisputedly contemplated the future appointment of such a judge, it is inconceivable that Congress would provide no provision to appeal from that judge's decisions. This is especially true given that the BAFJA was adopted to address Northern Pipeline, the Supreme Court decision that curtailed Congress' former broad grant of jurisdiction to non–Article III bankruptcy judges. Section 158 therefore must include appeals from bankruptcy judges in the Virgin Islands, and, a fortiori, the term "judicial district" as used therein must include the Virgin Islands. See also 28 U.S.C. SS 154(a), 156, 157(a)(1994)(setting forth general provisions that would have no force in relation to a duly appointed Virgin Islands bankruptcy judge if the terms "district" and "judicial district" were meant to exclude the Virgin Islands).

As noted by the majority, 28 U.S.C. S 451, may be cited as casting doubt upon our determination that the terms "judicial district" and "district" include the Virgin Islands. Section 451 defines those terms as "the districts enumerated in Chapter 5," i.e. districts containing only Article III courts. See 28 U.S.C. S 451 (1994). I agree with the majority, however, that this section is not controlling in light of the fact that it was codified 36 years prior to the

25

BAFJA and because this definition does not comport with the logical meaning of the terms as used in the BAFJA. See, e.g., Juneau Spruce, 342 U.S. at 241 (rejecting a historical definition also found in section 451 where that definition did not comport with the logical meaning of the term that best effectuated the purpose of the statute). At most, section 451 renders these terms facially ambiguous, an ambiguity that can be conclusively resolved by examining the legislative purpose behind adoption of the BAFJA.

C.

As the majority recognizes, the approach taken by the Court in International Longshoremen's & Warehousemen's Union v. Juneau Spruce Corp., 342 U.S. 237 (1952), is particularly instructive to our analysis of the proper interpretation of the BAFJA in light of the legislative purpose underlying its adoption. In Juneau Spruce, the Court was faced with determining whether the District Court of the Territory of Alaska was a `district court of the United States' for purposes of conferring upon it jurisdiction for actions brought under the Labor Management Relations Act ("LMRA"). Juneau Spruce, 342 U.S. at 240. While the Court recognized that the words `district court of the United States' are commonly used to describe Article III courts, the Court nevertheless held that in the context of the LMRA, that term was used to describe courts which exercise the jurisdiction of district courts. Id. at 241.

In so holding, the Court relied on the legislative purpose of the LMRA. The Court found that Congress enacted the LMRA to eliminate obstacles to suits in federal courts. Furthermore, the Court relied on the fact that the LMRA "extends its full sweep to Alaska as well as to the states and the other territories. The trial court is indeed the only court in Alaska to which recourse could be had." Id. at 242. Recognizing that applying the LMRA to the District Court of Alaska does not give the words "district court of the United States" their literal and historic meaning, the Court nonetheless embraced this reading as effectuating the uniform, national policy and purpose of the LMRA.

26

As previously noted, the BAFJA was sweeping legislation enacted to establish a national bankruptcy system that includes the Virgin Islands. The BAFJA includes provisions relating to the territories and specifically provides for the appointment of bankruptcy judges to the territories if authorized by Congress. As sweeping legislation designed to establish a national bankruptcy system, the BAFJA is at least as broad as the LMRA at issue in Juneau Spruce. In addition, as with the LMRA, if general terms within the BAFJA such as "district court" and "judicial district" do not include the District Court of the Virgin Islands, there are circumstances under which no court within the Virgin Islands would be able to effectuate its general provisions.3

Furthermore, the purpose of establishing a nationwide bankruptcy system is to alleviate the district courts of excessive workloads and to provide a system where judges with experience and expertise in bankruptcy matters can handle bankruptcy claims. In re Kaiser, 722 F.2d 1574, 1581 (2d Cir. 1983). In fact, in addition to revising the bankruptcy system, the BAFJA also created 85 new federal judgeships in order to "help alleviate the tremendous litigation backlogs in our courts." Collier on Bankruptcy, App. Vol. E, Pt. 6-146 (15th ed. 1997)(Statements from floor, 130 Cong. R. H. 7497).

The temporary transfer provision in the BAFJA is analogous to the temporary transfer of district judges found at 28 U.S.C. S 291 (1994). Transfer provisions such as

_____

3. The following example illustrates this point. Section 157 provides that "[e]ach district court may provide that any or all cases under title 11 . . . shall be referred to the bankruptcy judges for the district." 28 U.S.C. S 157(a)(1994). Suppose that a bankruptcy judge was appointed to the Virgin Islands under section 152(a)(4) after authorization by Congress. If general terms in the BAFJA such as "district court" or "judicial district" were read to exclude the District Court of the Virgin Islands, technically, the District Court of the Virgin Islands would never have the authority to refer bankruptcy cases pursuant to section 157(a) to a bankruptcy judge properly appointed under section 152(a)(4). In construing the BAFJA, we must presume that Congress did not intend this absurd result. See, e.g., United States v. Schneider, 14 F.3d 876, 880 (3d Cir. 1994)(stating that "[i]t is the obligation of the court to construe a statute to avoid absurd results . . . .").

these are to be used to "deal with an administrative problem" and are purely "ministerial". See Meeropol v. Nizer, 429 U.S. 1337, 1339 (1977)(discussing the nature of 28 U.S.C. S 291). Generally, such provisions are properly used to assist a circuit with a heavy workload. Id.

Given that Congress specifically included the Virgin Islands within the scope of the BAFJA, there is no rational reason for Congress to have intended to exclude the Virgin Islands from the transfer provision in the BAFJA and thereby preclude the District Court of the Virgin Islands from obtaining aid and specialized expertise in handling their bankruptcy caseload. Our construction of the terms "judicial district" and "district" as including the Virgin Islands therefore best effectuates the purpose and scope of the BAFJA generally and the transfer provision specifically. Accordingly, because the term "judicial district" must be read to include the Virgin Islands, section 155(a) grants the Third Circuit Judicial Council the authority to transfer a bankruptcy judge temporarily to serve in the Virgin Islands.

II.

In light of the foregoing discussion, it is clear that the BAFJA affirmatively confers upon the Council the authority for a temporary transfer of a bankruptcy judge to the Virgin Islands. At a minimum, however, the BAFJA is silent on the Council's authority; the BAFJA contains no affirmative Congressional statement denying the Council the authority to transfer bankruptcy judges to the Virgin Islands. Because the BAFJA contains no such affirmative restriction, I agree with the majority's conclusion that the Council has the inherent authority to make such a transfer pursuant to 28 U.S.C. S 332(d)(1994).

III.

I also agree with the majority's conclusion that regardless of the Council's authority to transfer temporarily a bankruptcy judge to the Virgin Islands under either the BAFJA or 28 U.S.C. S 332(d), Judge Cosetti's sanction orders are valid for the reasons the Court articulated in Willy v. Coastal Corp., 503 U.S. 131 (1992). In light of our

28

determination that both the BAFJA and 28 U.S.C.S 332(d) grant the Council the authority to make temporary transfer to the Virgin Islands, however, a specific determination on the validity of Judge Cosetti's sanction orders is unnecessary to our resolution of this appeal. I write separately with regard to this point only to note that while I agree with the majority's conclusion on the independent validity of Judge Cosetti's sanction orders, I view this issue as secondary to our analysis of the Council's authority to make a temporary transfer and consider it to be merely a supplemental ground for our decision.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit