**INTERNATIONAL TRANSACTIONS, LTD., Plaintiff,**

**v.**

**EMBOTELLADORA AGRAL REGIOMONTANA, S.A. DE C.V., et al., Defendants.**

**No. CIV.A. 3:01–CV–1140–G.**

United States District Court, N.D. Texas, Dallas Division.

Oct. 22, 2002.

Ernest W Leonard, Friedman & Feiger, Dallas, Gerald Thomas Drought, Martin & Drought, Inc., San Antonio, for International Transactions Limited, a Cayman Islands corporation, Plaintiff.

Molly Steele, Thompson & Knight, Dallas, George R Diaz–Arrastia, Schirrmeister Ajamie, Houston, Patrick J Neligan, Jr, Neligan Tarpley Andrews & Foley, Dallas,

Andrew C Schirrmeister, III, Schirrmeister Ajamie, Houston, George H Tarpley, Neligan Tarpley Andrews & Foley, Dallas, for Embotelladora Agral Regiomontana SA de CV, Embotelladora Agral de La Laguna SA de CV, Agral Arrendadora SA de CV, Agral Comisionista y Distribuidora SA de CV, Agral Inmobiliaria SA de CV, Pepsi–Gemex S A DE C V, Defendants.

## MEMORANDUM ORDER

FISH, Chief Judge.

Before the court is the motion of the defendants Agral Arrendadora, S.A. de C.V. and Agral Inmobiliaria, S.A. de C.V. (collectively, "Agral") to dismiss this case, pursuant to FED. R. CIV. P. 12(b)(1), for lack of subject matter jurisdiction.[1] For the reasons set forth in detail below, Agral's motion is granted.

### I. BACKGROUND

This is a collection case involving International Transactions, Ltd. ("ITL") as plaintiff and five Mexican companies as defendants.[2] ITL is a Cayman Islands corporation. *See* Original Petition to Confirm Arbitration Award and for Entry of Judgment on Award ("Complaint") ¶ 2, *attached to* Notice of Removal Pursuant to 9 U.S.C. §§ 205 & 302 and 28 U.S.C. § 1446 ("Notice of Removal") as Exhibit A. The Agral defendants all have their principal place of business in Mexico. Notice of Removal ¶¶ 8, 14 (second ¶ 14); Complaint ¶¶ 3–7. Agral bottles and distributes Pepsi–Cola products in northeastern Mexico. Complaint ¶ 9. ITL originally brought this suit against the Agral defendants in the 68th Judicial District Court of Dallas County, Texas seeking an order confirming an arbitration award under Texas law. *See id.* On June 14, 2001, two of the defendants, Agral Arrendadora, S.A. de C.V., and Agral Inmobiliaria, S.A. de C.V., removed the case to this court pursuant to 9 U.S.C. §§ 205 & 302 and 28 U.S.C. § 1446. *See* Docket Sheet; Notice of Removal ¶ 1.

According to the complaint, ITL entrusted ten million dollars to Sharp Capital, Inc. ("Sharp")[3] to invest in the purchase of a promissory note originally issued by Agral to NationsBank.[4] Complaint ¶ 9; *see also* Response to Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction and Memorandum in Support Thereof ("Plaintiff's Response") at 3. The loan proceeds were to be used by Agral for the construction of a Pepsi–Cola bottling plant in Monterrey, Mexico. Complaint ¶ 9. The promissory note contained an arbitration clause requiring that any dis-

---

1. Faced with an escalating number of motions filed by International Transactions, Ltd., Agral, and Pepsi–Gemex, this court called a status conference on July 23, 2002 to allay the court's concern that the case might be "spiraling out of control" since it had been pending for more than a year without any sign of moving closer toward a final disposition. *See* Transcript of July 23, 2002 Status Conference Hearing at 2. By the conclusion of the conference, all parties were in agreement that this motion to dismiss for lack of subject matter jurisdiction should be addressed before any others. *Id.* at 3, 5–6, 11–13, 19, 23.

2. The five Mexican companies are Agral Arrendadora, S.A. de C.V., Agral Inmobiliaria, S.A. de C.V., Embotelladora Agral Regiomontana, S.A. de C.V., Embotelladora Agral de la Laguna, S.A. de C.V., and Agral Comisionista y Distribuidora, S.A. de C.V (collectively, the "Agral defendants").

3. Sharp is a Texas corporation with its principal place of business in Texas. Notice of Removal ¶ 8 n. 22.

4. ITL asserts that Embotelladora Agral Regiomontana was the recipient of the funds entrusted to Sharp and that the other Agral defendants signed continuing and unconditional guaranties with NationsBank to guarantee the promissory note. *See* Plaintiff's Response to Defendants' Motions to Dismiss (filed on July 27, 2001) at 2.

putes between Sharp, the holder of the note, and the Agral defendants be resolved through arbitration. Complaint ¶ 10; *see also* Promissory Note ¶ 17, *attached to* Complaint.

Agral defaulted on the promissory note in 1996. Complaint ¶ 10. Shortly thereafter, Sharp—acting pursuant to the arbitration clause in the note—initiated arbitration proceedings against the Agral defendants with Judicial Arbitration and Mediation Services ("JAMS") in Dallas, Texas.[5] *Id.* In response, Agral brought two different suits against Sharp in this district. In the first case, Agral Regiomontana, one of the defendants in this action, filed suit against Sharp seeking to stay the arbitration proceedings commenced before JAMS and to compel arbitration before the American Arbitration Association. See *Embotelladora Agral Regiomontana, S.A. de C.V., et al. v. Sharp Capital Inc., et al.,* NO. 3:96–CV–1600–D (N.D.Tex.) (Fitzwater, J.). Magistrate Judge Jane Boyle eventually denied Agral's request for relief and dismissed the case on August 26, 1996. *See* Docket Sheet for No. 3:96–CV–1600–D. In the second suit, filed on October 15, 1996, four of the five current Agral defendants sought to compel the joinder of additional parties to the arbitration proceedings, as well as to assert a claim for affirmative relief against Sharp on the basis of usury. See *Embotelladora Agral Regiomontana, S.A. de C.V., et al. v. Sharp Capital Inc., et al.,* No. 3:96–CV–2862–P (N.D.Tex.) (Solis, J.). Judge Solis closed that case in 1999 on the ground that the dispute between the parties had been settled. *See* Docket Sheet for No. 3:96–CV–2862–P (entry of February 22, 1999).

On January 31, 1997, an arbitration award of more than eleven million dollars was entered in favor of Sharp. Complaint ¶ 11; *see also* Notice of Removal ¶ 2; Plaintiff's Response at 4. Less than a month later, four of the five Agral defendants filed for bankruptcy protection in Mexico. Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction ("Defendants' Motion") at 8. ITL apparently had notice of the bankruptcy proceedings but chose not to pursue its claim in the Mexican bankruptcy court. *Id.* at 9. On August 31, 1998, Sharp assigned the arbitral award and note to Jose Trevino Canamar ("Canamar"), a Mexican attorney working in Monterrey, Mexico, in exchange for an account of Bridgestone, Inc. and payment of Sharp's legal fees. *See* Defendants' Motion at 5; Plaintiff's Response at 6; Appendix to Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction ("Defendants' Appendix") at 52, 57–58; Supplemental Appendix to Reply Brief in Support of Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction ("Supplemental Appendix") at 2.[6] On September 9, 1998, Canamar assigned the same arbitral award and note to Grupo Embotellador Noreste, SA. de C.V. ("GEN") in exchange for 55 million pesos. *See* Defendants' Appendix at 71, 87. Sharp, Canamar, and GEN also signed on September 9, 1998 a "Master Agreement" releasing all claims against each other and against the Agral defendants. See *id.* at 86. The assignment between Sharp and Canamar and between Canamar and GEN, as well as the execution of the Master

---

**5.** The arbitration was apparently held in Monterrey, Mexico in November 1996. Notice of Removal ¶ 2.

**6.** Defendants include the original Spanish version, as well as an official English translation, of several documents contained in the appendices to the motion to dismiss. This court, however, will refer only to the English translation of these documents.

Agreement between Sharp, Canamar, and GEN, took place in Mexico.[7] See *id.* at 52, 71, 86–87.

On February 4, 1999, ITL brought suit in this district against Sharp and Mauricio A. Gutierrez, Sharp's President, seeking to regain custody of the arbitration award. See *International Transactions Limited v. Mauricio Gutierrez, et al.,* No. 3:99–CV– 0241–M (N.D.Tex.) (Lynn, J.). On November 6, 2001, GEN presented to the Mexican bankruptcy court the assignment of the arbitral award and note from Sharp to Canamar and from Canamar to GEN, leading that court to conclude ultimately that GEN was the owner of the award. Defendants' Motion at 9–10; *see also* Defendants' Appendix at 264–66, 272–75. A month later, according to the defendants, all five Agral companies merged with GEN.[8] Defendants' Appendix at 174. Then, on January 31, 2001, Judge Lynn dismissed all of ITL's claims against Sharp and Gutierrez but ordered the Special Master[9] for the Sharp Estate to convey the arbitration award to ITL.[10] Complaint ¶ 12; Notice of Removal ¶ 6; Memorandum Order and Judgment, filed January 31, 2001, in *International Transactions Limited v. Gutierrez,* No. 3:99–CV–0241– M (N.D.Tex.) (Lynn, J.). ITL thereafter brought the present action in a Texas state court to enforce payment of the arbitration award. Complaint ¶ 14.

After removing the case to this court, the Agral defendants filed various motions to dismiss the case for insufficient service of process, defective process, lack of personal jurisdiction, and international comity. Both Agral and ITL also filed a number of motions to strike certain materials contained in those motions. On March 13, 2002, this court issued a thirty-page memorandum order that denied Agral's motion to dismiss the case for lack of personal jurisdiction, defective process, and insufficient process and denied the motions to strike filed by both ITL and Agral. *See* Memorandum Order, Civil Action No. 3:01–CV–1140–G, March 13, 2002. The court also gave the Agral defendants thirty days to file a motion to dismiss this case for lack of subject matter jurisdiction, an issue which Agral had raised for the first time in its reply brief. *See* Agral Companies' Response to Plaintiff's Supplemental Brief (filed March 1, 2002) at 4. On April 1, 2002, this court granted ITL's motion for leave to amend its complaint in order to add as an additional defendant Pepsi–Gemex, which—according to ITL—assumed the liabilities of the Agral defendants. On

---

7. According to ITL, Sharp, the Agral Companies (acting through GEN), and Canamar acted in concert, through a series of fraudulent assignments, to assign the arbitration award back to GEN, ultimately circumventing the Mexican bankruptcy process. *See* Plaintiff's Response at 2–3.

8. There is some dispute as to whether the five Agral companies actually merged into GEN in December, 2001. *See* Plaintiff's Response at 7. ITL alleges that two Agral companies— Embotelladora Agral Regiomontana and Embotelladora Agral de la Laguna—were under the control of a company by the name of Tenedora del Noreste, S.A. de C.V. in July, 1997, and that by the end of 1998 all five were directly under the control of Pepsi–Gemex. *Id.* Agral continues to assert that all

five Agral companies "were merged in 2001 into GEN, not Pepsi Gemex." *See* Supplemental Appendix at 1.

9. On November 25, 1998, Judge Barefoot Sanders appointed this Special Master for Sharp in a civil enforcement action brought against Sharp by the Securities and Exchange Commission ("SEC"). See *Securities and Exchange Commission v. Sharp Capital, Inc. and Mauricio A. Gutierrez,* NO. 3:98–CV–2792–H (N.D.Tex.) (Sanders, J.).

10. Agral contends that ITL was actually assigned nothing by the Special Master because Sharp had already assigned its rights in the award to Canamar, who then assigned them to GEN. Notice of Removal ¶ 6.

April 12, 2002, two of the Agral defendants—Agral Arrendadora and Agral Inmobiliaria—filed, within the thirty-day limit imposed by the court, this motion to dismiss the case for lack of subject matter jurisdiction.

## II. *ANALYSIS*

### A. *Subject Matter Jurisdiction*

■ Federal courts are courts of limited jurisdiction. See *Kokkonen v. Guardian Life Insurance Company of America*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994); *Owen Equipment and Erection Company v. Kroger*, 437 U.S. 365, 374, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978). A federal court may exercise jurisdiction over cases only as expressly provided by the Constitution and laws of the United States. *See* U.S. CONST. art. III §§ 1–2; see also *Kokkonen*, 511 U.S. at 377, 114 S.Ct. 1673. Federal law gives the federal district courts original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Moreover, a party seeking relief in a federal district court bears the burden of establishing the subject matter jurisdiction of that court. *United States v. Hays*, 515 U.S. 737, 743, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995); *McNutt v. General Motors Acceptance Corporation of Indiana, Inc.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Langley v. Jackson State University*, 14 F.3d 1070, 1073 (5th Cir.), *cert. denied*, 513 U.S. 811, 115 S.Ct. 61, 130 L.Ed.2d 19 (1994); see also *International Primate Protection League v. Administrators of Tulane Educational Fund*, 500 U.S. 72, 77–78, 111 S.Ct. 1700, 114 L.Ed.2d 134 (1991) (noting that a decision on subject matter jurisdiction pursuant to Article III may be independent of any review of removal jurisdiction).

■ Rule 12(b)(1) of the Federal Rules of Civil Procedure authorizes the dismissal of a case for lack of jurisdiction over the subject matter. *See* FED. R. CIV. P. 12(b)(1). A motion to dismiss pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction must be considered by the court before any other challenge because "the court must find jurisdiction before determining the validity of a claim." *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir.1994) (internal citation omitted); see also *Ruhrgas AG v. Marathon Oil Company*, 526 U.S. 574, 577, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999) ("The requirement that jurisdiction be established as a threshold matter ... is inflexible and without exception") (citation and internal quotation marks omitted). On a Rule 12(b)(1) motion, which "concerns the court's 'very power to hear the case ... [,] the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.'" *MDPhysicians & Associates, Inc. v. State Board of Insurance*, 957 F.2d 178, 181 (5th Cir.) (quoting *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir.), *cert. denied*, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981)), *cert. denied*, 506 U.S. 861, 113 S.Ct. 179, 121 L.Ed.2d 125 (1992). In ruling on a motion to dismiss under Rule 12(b)(1), the court may rely on: "1) the complaint alone; 2) the complaint supplemented by undisputed facts; or 3) the complaint supplemented by undisputed facts and the court's resolution of disputed facts." *MCG, Inc. v. Great Western Energy Corp.*, 896 F.2d 170, 176 (5th Cir.1990) (citing *Williamson*, 645 F.2d at 413).

■ The standard for reviewing a motion under Rule 12(b)(1), however, depends on whether the defendant makes a facial or factual attack on the plaintiff's complaint. *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir.1981). A defendant makes a facial attack by the mere filing of a Rule 12(b)(1) motion. *Id.* In that case,

the trial court must look at the sufficiency of the allegations in the complaint, which are presumed to be true. *Id.* A defendant makes a factual attack, on the other hand, by providing affidavits, testimony, or other evidentiary materials challenging the jurisdiction of the court. *Id.* In a factual attack, the plaintiff is also required to submit facts in support of jurisdiction and has the burden of proving, by a preponderance of the evidence, that the trial court has subject matter jurisdiction over the claims. *Middle South Energy, Inc. v. City of New Orleans,* 800 F.2d 488, 490 (5th Cir.1986).

■ Importantly, lack of Article III standing is a defect in subject matter jurisdiction. See *Bender v. Williamsport Area School District,* 475 U.S. 534, 541–42, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986); *O'Shea v. Littleton,* 414 U.S. 488, 493–95, 504, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); see also *Sommers Drug Stores Company Employee Profit Sharing Trust v. Corrigan,* 883 F.2d 345, 348 (5th Cir.1989) ("standing is essential to the exercise of jurisdiction, and ... lack of standing can be raised at any time by a party or by the court.") (citing *United States v. One 18th Century Colombian Monstrance,* 797 F.2d 1370, 1374 (5th Cir.1986), *cert. denied,* 481 U.S. 1014, 107 S.Ct. 1889, 95 L.Ed.2d 496 (1987)). Therefore, when a plaintiff lacks standing to sue in federal court, it is appropriate for this court to dismiss the action, pursuant to Rule 12(b)(1), for want of subject matter jurisdiction. See *Chair King, Inc. v. Houston Cellular Corporation,* 131 F.3d 507, 509 (5th Cir.1997); *Bender,* 475 U.S. at 541, 106 S.Ct. 1326.

In the instant motion, the Agral defendants have presented the court with a factual attack on ITL's complaint pursuant to Rule 12(b)(1), because they have submitted affidavits and other evidentiary materials in support of their motion. Specifically, the defendants maintain that ITL lacks Article III standing to sue on the arbitral award because ITL is unable to establish that the relief it requests will redress ITL's alleged injury and, further, because ITL has failed to show a causal connection between any alleged conduct of the Agral defendants and ITL's alleged injury. Defendants' Motion at 7–8. For the reasons discussed below, the court agrees with the defendants' assertion that this court lacks subject matter jurisdiction due to ITL's lack of Article III standing.

B. *The Standing Requirement*

■ Article III of the United States Constitution limits federal courts' jurisdiction to "cases" and "controversies." U.S. CONST. art. III, § 2, cl. 1; see also *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). The case or controversy limitation requires that a party have standing to invoke federal jurisdiction. See *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). The gist of the standing inquiry is determining whether a plaintiff has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker,* 369 U.S. at 204, 82 S.Ct. 691. Standing therefore centers on "whether the litigant is entitled to have the court decide the merits of the dispute or particular issues." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Moreover, federal courts are "under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of [the jurisdictional] doctrines." *Hays,* 515 U.S. at 742, 115 S.Ct. 2431 (quoting *FW/PBS, Inc. v. Dallas,* 493 U.S.

215, 230–31, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990)) (internal quotation marks omitted); see also *Corrigan*, 883 F.2d at 348 ("Standing, since it goes to the very power of the court to act, must exist at all stages of the proceeding") (quoting *Safir v. Dole*, 718 F.2d 475, 481 (D.C.Cir.1983), *cert. denied*, 467 U.S. 1206, 104 S.Ct. 2389, 81 L.Ed.2d 347 (1984)).

 The Supreme Court has held that Article III standing, at its "irreducible constitutional minimum," requires that a plaintiff demonstrate: (1) "an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized [11] and (b) actual or imminent;" (2) "a causal connection between the injury and the conduct complained of—the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court;" and (3) a substantial likelihood that the injury will be "redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130 (internal citations, quotation marks, and footnote omitted); see also *Vermont Agency of Natural Resources v. United States*, 529 U.S. 765, 771, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000); *Public Citizen, Inc. v. Bomer*, 274 F.3d 212, 217–18 (5th Cir.2002). All three elements must exist to establish Article III standing. *Vermont*, 529 U.S. at 771, 120 S.Ct. 1858. Because these elements "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130; see also *Gladstone Realtors v.* *Village of Bellwood*, 441 U.S. 91, 114–15, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979).

### 1. *Injury in Fact*

 ITL has alleged that the Agral companies and others engaged in a "tangled web of deception designed to deprive ITL of its legal right to recover on an [a]rbitration [a]ward." Plaintiff's Response at 1. More specifically, ITL argues that the defendants "have failed and otherwise refused to make any payments in satisfaction of" the arbitral award, which is "due and outstanding," Complaint ¶ 13, and that the defendants, along with Sharp, Canamar, and GEN, conspired to deprive ITL of this award through a series of fraudulent assignments. Plaintiff's Response at 2–3. ITL claims losses from its inability to collect on the award. *See* Complaint ¶ 11; Plaintiff's Response at 3.

An allegation of economic loss resulting from a party's inability to collect a multi-million dollar arbitration award is a sufficient injury for standing purposes. See *Sierra Club v. Morton*, 405 U.S. 727, 738, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (noting that Article III standing may be based on monetary, psychological, and even aesthetic injury); see also *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 152, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Bertulli v. Independent Association of Continental Pilots*, 242 F.3d 290, 295 (5th Cir.2001); *Sabine River Authority v. United States Department of Interior*, 951 F.2d 669, 674 (5th Cir.), *cert. denied*, 506 U.S. 823, 113 S.Ct. 75, 121 L.Ed.2d 40 (1992). Further, the inability to collect the arbitral award presumably affects ITL in a "personal and individual way," as it allegedly deprives ITL of the use of over 10 million dollars.

---

11. The Court further stated that by "particularized," it meant that "the injury must affect the plaintiff in a personal and individual way." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n. 1, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

*See generally* Plaintiff's Response at 1–3; Award, *attached to* Complaint as Exhibit B. The court therefore finds that ITL has asserted an injury which is sufficiently "concrete and particularized" to satisfy the threshold element of the standing inquiry. *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130; see also *City of Los Angeles v. Lyons,* 461 U.S. 95, 101–02, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *Bomer,* 274 F.3d at 217. Injury alone, however, is insufficient for Article III standing. As mentioned above, ITL must further demonstrate that the injury is "fairly traceable to the defendant[s'] allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen,* 468 U.S. at 751, 104 S.Ct. 3315.

### 2. *Redressability*

A plaintiff must demonstrate that it is "likely, as opposed to merely speculative, that the [alleged] injury will be redressed by a favorable decision" of the court. *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130 (internal quotation marks omitted). Relief which fails to remedy the injury alleged simply cannot be used to "bootstrap a plaintiff into federal court [—] that is the very essence of the redressability requirement." *Steel Company v. Citizens for a Better Environment,* 523 U.S. 83, 107, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). ITL requests that this court confirm the arbitration award of January 31, 1997. *See* Complaint. Such a judgment would not, however, redress ITL's alleged economic injury.

It is undisputed that an arbitration award of more than eleven million dollars was entered in favor of Sharp on January 31, 1997, *see* Complaint ¶ 11; Notice of Removal ¶ 2; Plaintiff's Response at 4, and that Sharp later assigned the arbitral award and note to Canamar on August 31, 1998 in exchange for an account of Bridgestone, Inc. and payment of Sharp's legal fees. *See* Defendants' Motion at 5; Plaintiff's Response at 6; Defendants' Appendix

at 52, 57. It is further undisputed that on September 9, 1998, Canamar assigned the arbitral award and note to GEN in exchange for 55 million pesos. *See* Defendants' Appendix at 71, 87, and that Sharp, Canamar, and GEN signed an agreement releasing all claims against each other and the Agral Companies that very same day. Defendants' Appendix at 86; Plaintiff's Response at 6–7. The main issue in dispute is whether the assignments themselves were valid. That issue, however, has already been decided by the Mexican bankruptcy court, and a review of that issue by this court would violate principles of international comity.

Comity is the "recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation." *Societe Nationale Industrielle Aerospatiale v. United States District Court for Southern District of Iowa,* 482 U.S. 522, 544 n. 27, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987) (quoting *Hilton v. Guyot,* 159 U.S. 113, 163–64, 16 S.Ct. 139, 40 L.Ed. 95 (1895)); see also *Banque Libanaise Pour Le Commerce v. Khreich,* 915 F.2d 1000, 1004 (5th Cir. 1990). "[T]he central precept of comity teaches that, when possible, the decisions of foreign tribunals should be given effect in domestic courts, since recognition fosters international cooperation and encourages reciprocity." *Laker Airways Limited v. Sabena, Belgian World Airlines,* 731 F.2d 909, 937 (D.C.Cir.1984). The Supreme Court has long held that, under principles of international comity, a foreign court's determination of a matter is conclusive in a federal court where: (1) the foreign judgment was rendered by a court of competent jurisdiction, which had jurisdiction over the cause and parties; (2) the judgment is supported by due allegations and proof; (3) the relevant parties had an opportunity to be heard; and (4) the for-

eign court follows civilized procedural rules. *Hilton,* 159 U.S. at 205–206, 16 S.Ct. 139; see also *Hartford Fire Insurance Company v. California,* 509 U.S. 764, 817, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993); *Overseas Inns S.A. P.A. v. United States,* 911 F.2d 1146, 1148 (5th Cir.1990); RESTATEMENT (SECOND) OF CONFLICT OF LAWS: Recognition of Foreign National Judgments § 98 cmt. c (1971) (citing *Hilton* as the seminal decision on the recognition of foreign judgments). Finally, "[c]omity should be withheld only when its acceptance would be contrary or prejudicial to the interest of the nation called upon to give it effect." *Overseas Inns,* 911 F.2d at 1148 (citation omitted); see also *Laker Airways,* 731 F.2d at 937–38.

The Mexican bankruptcy court's ruling firmly satisfies each of the *Hilton* elements. First and foremost, it is well settled that Mexican courts follow civilized procedural rules. See *Gonzalez v. Chrysler Corp.,* 301 F.3d 377, 383–84 (5th Cir. 2002) (concluding that Mexican courts provide an adequate forum in civil suits); *Tavarez v. United States Attorney General,* 668 F.2d 805, 810–11 (5th Cir.1982) (recognizing the Mexican courts as competent to try and convict criminal offenders); *Gulf and Southern Terminal Corporation v. S.S. President Roxas,* 701 F.2d 1110, 1112 (4th Cir.) (concluding that *in rem* proceedings in Mexican bankruptcy courts are virtually identical to those employed under American law), *cert. denied,* 462 U.S. 1133, 103 S.Ct. 3115, 77 L.Ed.2d 1369 (1983); see also *In re Blackwell,* 267 B.R. 741 (Bankr.W.D.Tex.2001) (recognizing Mexican bankruptcy courts as competent and finding that Mexican law provides adequate due process protection in case between Cayman Islands plaintiff and Mexican defendants); *Seguros Comercial Americas S.A. de C.V. v. American President*

*dent Lines, Ltd.,* 933 F.Supp. 1301 (S.D.Tex.1996) (recognizing Mexico as an adequate alternative forum for the purposes of *forum non conveniens* ).

The rendering court was also a court of competent jurisdiction, which had jurisdiction over the cause of action and the parties. Federal bankruptcy courts in this circuit have repeatedly found that Mexican bankruptcy courts are competent to hear bankruptcy and insolvency matters of Mexican corporations. See, *e.g., Blackwell,* 267 B.R. at 758; *In re Xacur,* 219 B.R. 956, 969–70 (Bankr.S.D.Tex.1998). In February 1997, four of the five Agral defendants filed for suspension-of-payments [12] protection in the Mexican bankruptcy court, which the court later converted into bankruptcy proceedings. *See* Defendants' Motion at 8; Defendants' Appendix at 49, 178. All five Agral defendants are Mexican companies, which apparently sought relief in the appropriate bankruptcy court in their geographic area. Complaint ¶¶ 2–7; Defendants' Motion at 11–12. ITL has presented no reason why the Mexican bankruptcy court would not be a court of competent jurisdiction over the Agral defendants' bankruptcy proceedings.

Additionally, all relevant parties had an opportunity to be heard by the Mexican court. As discussed, the Agral defendants filed for bankruptcy protection in Mexico sometime in February, 1997. Defendants' Motion at 8. Agral, GEN, and Sharp were all parties to that proceeding. *See* Defendants' Motion at 9; Defendants' Appendix at 272–75. Sharp, then ITL's agent, sought possession of the arbitral award in the Mexican court. *See generally* Defendants' Appendix at 178–82, 267–71. Because Sharp was ITL's agent and acting within the scope of its agency, ITL had

---

**12.** A suspension-of-payments proceeding is analogous to a corporate reorganization pro-

ceeding in the United States bankruptcy courts. See *Xacur,* 219 B.R. at 962 n. 4.

constructive notice of these proceedings.[13] See *American Standard Credit, Inc. v. National Cement Company*, 643 F.2d 248, 270–71 n. 16 (5th Cir.1981) (noting that the "general rule is well established that a corporation is charged with constructive knowledge, regardless of its actual knowledge, of all material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of his employment within the scope of his authority") (citation omitted); see also *United States v. Currency Totalling $48,318.08*, 609 F.2d 210, 214–15 (5th Cir.1980); *Harris v. Gulf Refining Company*, 240 F.2d 249, 252 (5th Cir.1957); RESTATEMENT (SECOND) OF AGENCY §§ 276, 278 (1958). ITL also had actual notice of the Agral bankruptcy proceedings. ITL pursued claims against Sharp in the SEC's civil enforcement action against Sharp and its former president, Mauricio A. Gutierrez. Defendants' Appendix at 276–78. The Special Master appointed in that case specifically mentioned the Agral bankruptcy proceedings in a number of publicly filed documents. See *id.* at 134 (Special Master's First Report), 43a (Special Master's Second Report). The Special Master even noted how carefully ITL had "track[ed] the SEC's lawsuit and ... kept apprised of the Special Master's actions relating to ... distribution." *Id.* at 283. Moreover, the Agral defendants themselves put ITL on

notice of the Mexican proceedings. Prior to a final ruling on ownership of the award by the Mexican court, the defendants discussed the bankruptcy proceedings and argued—in a number of motions before this court—that ITL should pursue its claims in the Mexican bankruptcy court, rather than here.[14] ITL, therefore, has had actual and constructive notice of the bankruptcy proceedings but nevertheless chose not to pursue its claims in that court. ITL cannot now complain that it was not a party to the Mexican bankruptcy proceedings and attempt to circumvent that court's ruling on ownership of the arbitral award. Thus, all relevant parties, including ITL, had notice and an opportunity to be heard by the Mexican court.

The Mexican court's determination of ownership of the award also appears to be supported by due allegations and proof. On November 6, 2001, GEN presented to the Mexican bankruptcy court evidence of the assignment of the arbitral award and note from Sharp to Canamar and from Canamar to GEN. Defendants' Motion at 9; Defendants' Appendix at 185–98, 242–55. On November 16, 2001, that court concluded that GEN was the rightful owner of the award. Defendants' Motion at 9; Defendants' Appendix at 256–66. The defendants have included in the record here various documents in Spanish, accompa-

---

13. It is undisputed that Sharp was ITL's agent with the actual authority to act on ITL's behalf as the "custodian and servicing agent" for the arbitral award. *See* Plaintiff's Response at 3–4; *see also* Complaint ¶¶ 9–10; Defendants' Motion at 5. ITL entrusted Sharp with the funds to purchase the promissory note at issue, to act as the collection agent for ITL when the defendants defaulted on the note, and to initiate arbitration proceedings against the defendants (where Sharp was the named plaintiff). Complaint ¶¶ 9–10; Defendants' Motion at 5. In fact, until recently, ITL was merely referred to as an "unknown investor." Defendants' Reply at 1.

14. *See* Motion of Defendants Embotelladora Agral Regiomontana, S.A. de C.V., Embotelladora Agral de la Laguna, S.A. de C.V., and Agral Comisionista y Distribuidora, S.A. de C.V. to Dismiss for Insufficient Service of Process, Defective Process, and Lack of Personal Jurisdiction (FED. R. CIV. P. 12(b)(2), (4), (5)) (filed July 5, 2001) ¶¶ 19–20; Motion of Defendants Agral Arrendadora, S.A. de C.V. and Agral Inmobiliaria, S.A. de C.V. to Dismiss for Insufficient Service of Process and Lack of Personal Jurisdiction (FED. R. CIV. P. 12(b)(2), (5)) (filed on July 5, 2001) ¶ 9; Reply in Support of the Motions to Dismiss of All Five Defendants (filed August 23, 2001) at 14–18.

nied by notarized English translations, which are copies of the motions that were before the Mexican court and that court's ruling on the ownership of the arbitral award. *See generally* Defendants' Appendix; Supplemental Appendix. ITL challenges these documents by arguing simply that the meaning of the translations is unclear. *See* Plaintiff's Response at 9, 15. ITL, however, offers absolutely no evidence to challenge either the authenticity of these documents or the accuracy of the translations. Because ITL has provided no evidence to the contrary, this court finds that the judgment of the Mexican bankruptcy court was adequately supported by due allegations and proof.

Finally, acceptance of the Mexican court's ruling would not be "contrary or prejudicial to the interest of the nation called upon to give it effect." *Overseas Inns*, 911 F.2d at 1148 (quoting *Somportex Limited v. Philadelphia Chewing Gum Corp.*, 453 F.2d 435, 440 (3d Cir.1971), *cert. denied*, 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1972)). ITL is a corporation based in the Cayman Islands and all five Agral defendants are Mexican corporations. *See* Complaint ¶¶ 2–7, Notice of Removal ¶¶ 8, 14 (second ¶ 14). The arbitration was held, and the award made, in Mexico. Notice of Removal ¶ 2. Even the assignments from Sharp to Canamar and from Canamar to GEN, as well as the execution of the Master Agreement between Sharp, Canamar, and GEN, took place in Mexico. *See* Defendants' Appendix at 52–62; 71–73. There are simply no discernable American interests at stake in this case. Thus, the Mexican bankruptcy court's determination of ownership of the arbitral award must be recognized by this court as a matter of international comity. This court accordingly accepts the Mexican court's ruling and concludes that ITL did not have an interest in that award when the Special Master assigned it to ITL. A judgment confirming the award will not, therefore, redress ITL's alleged injury.[15]

In sum, this court concludes that there is no case or controversy before it to be adjudicated because ITL lacks standing to pursue the relief sought against the Agral defendants. ITL has failed to meet the burden of proof required to survive the defendants' factual attack on its complaint, and this court must therefore dismiss ITL's complaint for lack of subject matter jurisdiction.

### III. CONCLUSION

For the reasons set forth above, the defendants' motion to dismiss plaintiff's complaint pursuant to Fed R. Civ. P. 12(b)(1) is **GRANTED**.[16]

**SO ORDERED.**

---

15. As discussed above, a failure to establish any of the three elements of Article III standing is fatal to a plaintiff's ability to obtain relief in federal court. See *Vermont*, 529 U.S. at 771, 120 S.Ct. 1858; *Doe v. School Board of Ouachita Parish*, 274 F.3d 289, 291–92 (5th Cir.2001). Because the court finds a failure of redressability, the remaining causational element of Article III standing need not be addressed.

16. Because ITL's complaint must be dismissed for want of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), the remaining motions in this case are denied as moot. *See* Docket Sheet (providing a current list of pending motions).